UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
NATS EMPEROR SHIPPING LIMITED,

                                          08 Civ. 3763 (BSJ)

              Plaintiff,

                                              DECLARATION

         -against-


HAWKNET LIMITED and BROBULK LIMITED,


              Defendants.
-------------------------------------X

     I, Edward A. Keane, hereby declare as follows:

     1.   I am a partner with the firm of Mahoney & Keane, LLP,
counsel of record for plaintiff, NATS EMPEROR SHIPPING LIMITED.
Based upon my personal knowledge and my review of the file
maintained by my office, I am familiar with the proceedings in
this case.

     2.   Herewith attached are true copies of the following:

              Exhibit 1:    Time Charter between plaintiff and
                            HAWKNET;

              Exhibit 2:    First Page of the Sub-Charter
                            entered into by defendant HAWKNET
                            LIMITED;

              Exhibit 3:    Transaction Detail Reports of Wire
                            Transfers; and

              Exhibit 4:    Declaration of John Hicks, sworn to
                            on May 12, 2008, with Annexed
                            HAWKNET Director's Report.

1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 12, 2008
New York, New York

Respectfully submitted,

MAHONEY & KEANE, LLP
Attorneys for Plaintiff
NATS EMPEROR SHIPPING LIMITED

By: _____
Edward A. Keane (EK 1398)
111 Broadway, 10th Floor
New York, NY 10006
(212) 385-1422

ORIGINAL



# Time Charter
GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party**, made and concluded in *London* ....................................................................................

2  Between *NATS EMPEROR SHIPPING LIMITED* ..................................... *29th* day of *February*, ..................... *19 2008*

3  Owners of the good *Cyprus* ........................................................ Steamship/Motorship *"NATS EMPEROR"* ......................................... of *(See Clause 97)*

4  of *22,540* .................... tons gross register, and *13,020* .................... tons net register, having engines of ........................................ indicated horse power

5  and with hull, *cargo spaces*, machinery and equipment in a thoroughly efficient state, and classed *G.L. Highest* ........................................

6  at ........................... of about ........................... cubic feet bale capacity *available for cargo*, about *37,916* .................... *metric*., tons of 2240 lbs.

7  deadweight capacity (cargo and bunkers, including fresh water ~~and stores not exceeding one and one half percent of ship's deadweight capacity,~~

8  ~~allowing a minimum of fifty tons) on a draft of~~ ........................... ~~feet~~ ........................... ~~inches on~~ ........................... ~~Summer freeboard, inclusive of permanent bunkers,~~

9  ~~which are of the capacity of about~~ ........................... ~~tons of fuel,~~ and capable of steaming, ~~fully laden~~ *throughout the entire period of this Charter Party* under good

10  weather conditions about ........................... knots on a consumption of about ........................... *(*tons of best Welsh coal— best grade fuel oil— best grade Diesel oil,

11  now *trading* ..................................................................................................................................................

12  ........................... and *Hawknet Limited* ..................................................................................................................

13  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about *time-charter period of minimum 3.5 to maximum 6 months trading via safe ports, safe berths always afloat always within*

15  *Institute Warranty Limits with lawful, harmless and non-dangerous cargo* ........................... within below mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owner's obligations*

17  *hereunder.*

18  Vessel to be placed at the disposal of the Charterers, at *Delivery on dropping outward pilot Karachi any time day or night, Sundays and*

19  *Holidays included.* ..................................................................................................................................

20  ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

21  ~~the Charterers may direct. If such dock, wharf or place be not available at the~~ *time and fit in every way to receive and carry permissible, harmless and non-dangerous cargo and to be maintained in such*

22  *condition during the entire period of this Charter* ~~with clean swept holds~~ and tight, staunch, strong and in every way fitted for the

23  service, having water ballast, *cranes*, ~~winches~~ and

24  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *cranes* ~~winches~~ at one and the same

25  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

26  dise, including petroleum or its products, in proper containers, excluding *(See Clause 52)* ..................................................................

27  ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

28  ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~

29  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

30  ~~Mexico, and/or South America~~ *within Institute Warranty Limits - (See Clause 48)* ..................................................................

31  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~ ........................... *and/or Europe*

32  ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic.~~

33  ..................................................................................................................................................

34  ..................................................................................................................................................

35  as the Charterers or their Agents shall direct, on the following conditions:

36  1.    That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees *including agency fees, if any,*

37  *(Refer to Clause 87)* of the Crew; shall pay for the

38  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

39  the vessel in a thoroughly efficient state in hull, deck, *cargo spaces*, machinery and equipment for and during the service.

39  2.    That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary*

40  *gangway watchmen if compulsory*, shore cranemen Agencies, Commissions, taxes / charges / dues on hire / freight and cargo as well

40  *Pilotage, tallymen, boatage except boatage for crew purposes, towage, canal dues, municipality or state taxes, hatch watchmen,*

41  *as stevedoring expenses plus all other charges that are usually paid for by Time Charterers.*

0  Consular Charges (except those pertaining to the Crew), *and flag of the vessel* and all other usual expenses except those before stated, but when the vessel

0  puts into

1  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

2  illness of the crew *or cargo carried prior to delivery* to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while

3  vessel is employed under this charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

4  ~~of six months or more.~~

5  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings *and pay for any extra fittings, certificates and special*

6  *requirements* requisite for a special trade / port or unusual cargo, but

7  Owners to allow them the use of any dunnage ~~and shifting boards~~ already aboard vessel. ~~Charterers to have the privilege of using shifting boards~~

8  ~~for dunnage, they making good any damage thereto.~~

8  3.    That the Charterers, ~~at the port of~~ *on* delivery, and the Owners, ~~at the port of~~ *on* re-delivery, shall take over and pay for all fuel remaining on

49  board the vessel ~~at the current prices in the respective ports, the vessel to be delivered with not less than~~ .................................................................................... ~~tons and not more than~~

50  .................... ~~tons and to be re-delivered with not less than~~ ..................... ~~tons and not more than~~ ...................... ~~tons.~~

51  ~~4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of~~ *(as per Clause 29)* ...................................................

52  ...................... ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53  ~~stores, on~~ ....................................... ~~summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at~~

54  ~~and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary~~

55  ~~wear and tear excepted, to the Owners (unless lost) at~~ *(See Clause 90)* .....................................................................................

56  ...................................................... unless otherwise mutually agreed. Charterers are to give Owners not less than *20/15/10/5/3/2/1* days

57  notice of vessels expected date of re-delivery, and probable port.

58  5.   Payment of said hire to be made in *as per Owners' banking details* ~~New York in cash in United States Currency, semi-monthly~~ *every 15*

58  *(fifteen) days* in advance, and for the last half month ~~or~~

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. *(See Clause 29).* ~~Time to count from 7 a.m. on the working~~

63  ~~day~~

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64  ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the ~~Captain~~ *Owners*, by the Charterers or their Agents, *at their*

65  *discretion* subject

66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances.

68  6.   That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place *in port or elsewhere* that Charterers or

68  their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70  ~~lie aground.~~

71  7.   That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also

71  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74  ~~paying Owners~~ ................................. ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense~~ *No passengers allowed.*

76  8.   That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

77  agency; and Charterers are to load, stow, ~~and trim,~~ *lash, unlash, secure, unsecure lay plastic, tally and discharge and provide separation*

78  *materials for* the cargo at their expense *and all customary services* under the supervision of the Captain, who is to sign Bills of Lading for

79  cargo as presented, in *strict* conformity with Mate's ~~or Tally Clerk's~~ receipts.

80  9.   That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary and *practical,* make a change in the appointments.

82  10.   That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *at his own risk always provided prior his*

82  *boarding he has signed and delivery Owners' relevant Letter of Indemnity to vessel's Master* and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of $15.00 per day. Owners to victual Pilots and Customs Officers, ~~and also, when authorized by Charterers or their Agents,~~ to victual Tally

85  Clerks, Stevedore's Foreman, etc., Charterers paying *U.S.$1,200 (One Thousand Two Hundred Dollars) lumpsum per month pro rata for*

86  *cables/victualling/entertaining.* ~~at the current rate per meal, for all such victualling.~~

87  11.   That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88  terers, their Agents or Supercargo, when required, with a true copy of *deck and engine logs in English* ~~daily Logs,~~ showing the course of the vessel and

89  distance run and the con-

89  sumption of fuel.

90  12.   That the Captain shall use diligence in caring for the ventilation of the cargo *as instructed in writing by the Charterers.*

91  ~~13.   That the Charterers shall have the option of continuing this charter for a further period of~~ ..............................................................

92  .................................................................................................................................................................................................................

93  ~~on giving written notice thereof to the Owners or their Agents~~ ....................................... ~~days previous to the expiration of the first-named term, or any declared option.~~

94  14.   That if required by Charterers, time not to commence before *28th February, 2008* ....................................... and should vessel

95  not have given written notice of readiness on or before *5th March, 2008* ....................................... ~~but not later than 4 p.m.~~ Charterers or

96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97  15.   That in the event of the loss of time from deficiency *and/or default and/or strikes of Officers and crew whether due to labour*

97  *dispute or otherwise or deficiency* of men or stores, fire, breakdown or damages to hull, machinery or equipment,

98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

01  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

01  thereof, and all extra *directly related* expenses shall be deducted from the hire.

02  16.   That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

03  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

04  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

05  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

06  purpose of saving life and property.

07  17.   *Arbitration as per Clause 61.* ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three~~

107 ~~persons at New York,~~

108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~

109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men~~ *See Clause 93.*

110 ~~18.~~ That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due under this Charter, including General

111 ~~Average~~

112 ~~age contributions, and the~~ Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

113 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

114 might have priority over the title and interest of the owners in the vessel.

115 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

116 Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules ~~1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~

116 York-Antwerp Rules *1994 In London and subsequent amendments therefrom* ~~1924, at such port or place in the United States as may be selected by~~

117 ~~the carrier, and as to matters not provided for by these~~

117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125 ~~United States money.~~

126 ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,~~

127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131 ~~ships belonged to strangers. (See New Jason Clause as attached)~~

132 ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.~~

133 20. Fuel/*Diesel* used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed as to quantity, and the

134 cost of replacing same, to be allowed by Owners.

135 ~~21.~~ That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a

136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service~~

138 *Drydocking only in the event of emergency.*

139 ...................................................................................................................................................................................

140 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes* ~~derricks~~ ) capable of handling lifts up to *maximum capacity in*

141 *accordance with the Description Clause* ~~three tons, also~~

141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts,~~ Owners are to provide necessary gear for

142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *sufficient light for* ~~lanterns and oil~~

142 ~~for~~

143 night work *in all open holds simultaneously* ~~, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at~~

144 ~~Charterers' expense. The~~

144 Charterers to have the use of any gear on board the vessel.

145 23. Vessel to work night and day *and Sundays and Holidays*, if required by Charterers, and all *cranes* ~~winches~~ to be at Charterers' disposal during

145 loading and discharging; *All winchmen/cranemen to be provided and paid by Charterers. Watchmen ordered by the Master to be for*

146 *Owners' account. All other watchmen including compulsory to be for Charterers' account.* ~~and~~

146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~

147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~

148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~

149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~

150 ~~thereby.~~ *(See Clause 37)*

151 ~~24.~~ ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~

152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~

153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~

154 ~~of which are to be included in all bills of lading issued hereunder.~~

155 ~~U. S. A. Clause Paramount~~

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 ~~Both to Blame Collision Clause~~

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~

164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~

165 ~~carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her~~

166 ~~owners as part of their claim against the carrying ship or carrier.~~ *(See Both-to-Blame Collision Clause as attached)*

167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169 port or to get out after having completed loading or discharging. *Trading always via ice free port(s) and vessel not to force ice or to follow*

169 *ice-breaker(s). (See also Clause 44).*

170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the



71    navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.

72      27.   A commission of *1.25* ~~2 1/2~~ per cent is payable by the Vessel and Owners to *Howe Robinson & Company Limited plus 1.25 percent*

73    *commission to Messrs Seawind Maritime Ltd* ...........................................................................................................................

74    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

75      28.   An address commission of 2 1/2 per cent payable to *Charterers,*......................................................... on the hire earned and paid under this Charter.

Clauses *29*...... to *82 Conwartime Clause, New Jason Clause, General Paramount Clause and New Both-to-Blame Collision Clause, ISPS Clause* inclusive as attached hereto, are deemed to be fully incorporated *in all Bills of Lading issued* in this charter party.

Owners                                          Charterers

..........................................................            ..........................................................

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.



M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

Clause 29    Hire

a. Charterers shall pay for the use of the vessel at the rat of U.S.$38,000 (Thirty Eight Thousand Dollars) daily including overtime fifteen days in advance. GMT will apply on delivery and redelivery respectively.

b. It is agreed that the hire is to be considered correctly paid upon receipt same to Owner's bankers as stated hereunder.

However, in the event of a default in the payment of hire, Owners are to telex Charterers informing them of the default. Owners are not to withdraw the vessel if Charterers make good the default within three clear bank working days of receiving Owners' notification. Failing the punctual and regular payment of the hire, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers without prejudice to any claims the Owners may otherwise have on the Charterers.

c. Hire (see Clause 5) to be paid every 15 days in advance to Owner's bank account.

Owners banking details as followings:
HSBC BANK
Piraeus Branch
93, Akti Miaouli Street
Piraeus 185 38
Greece

In Favour of: Pitiousa Shipping S.A.
Account Number: 001-049741-071

BIC (Bank Identification Code of Swift Address): MIDLGRAA
IBAN NO.: GR51 0710 0010 0000 0104 9741 071

Any balance due to Owners/Charterers to be settled within three banking days after vessel's redelivery.

No any Owners' items to be paid for by Charterers in any ports unless specifically authorised by owners to be paid by Charterers. Owners' expenses to be deducted only against supporting vouchers which to be sent to Owners promptly.

Charterers are entitled to deduct from last sufficient hire payments for estimated bunker on redelivery.

Clause 30    Notices

Owners/Master shall give notice on fixing, only definite notice of delivery to agents, as advised, plus copy to Charterers.

Master to give notices at sea every two days and ten plus seven plus five days approximate for redelivery.

HOWE ROBINSON                    1

## M.V. "NATS EMPEROR"
## CHARTER PARTY DATED 29TH FEBRUARY, 2008
### ADDITIONAL CLAUSES

**Clause 31     House Flag/Markings**

The Charterers or their sub Charterers shall have the liberty of flying their own house-flag and maintain the funnel and ship's sides with their colours/insignia.  Owner's markings shall be restored before redelivery at Charterers' expense.

**Clause 32     Arrest/Seizure**

Should the vessel be arrested and/or seized during the currency of this Charter Party at the suit of any person having or purporting to have a claim against, or any interest in the vessel or by any other default of the Owners, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest only if such arrest affects loading/discharging operations and the Owners shall reimburse to the Charterers any direct, proven and duly supported by vouchers expenditure which they may incur under this Charter Party in respect of any period during which by virtue of the operations of this clause no hire is payable unless such arrest is caused by actions of Charterers and/or their sub Charterers and/or their agents.

**Clause 33**

Deleted.

**Clause 34     Discrimination**

In the event of loss of time due to boycott of the vessel by shore labour or arising from government restrictions by reasons of vessel's flag or the terms and conditions by which members of the crew are employed or by reason of Owner's operation or control, vessel to be off-hire and all directly related expense to be for Owner's account.

**Clause 35**

Should the vessel deviate or put back during a voyage, contrary to the orders or directions of the Charterers for any reason, except saving life, the hire to be suspended from the time of her putting back or deviating until she is again in the same or equidistant position from the destination and the voyage resumed therefrom.

After suspension of hire from any cause, the vessel shall be placed at Charterer's disposal at the same port or position where hire was suspended.  Charterers shall, however, in their option accept the vessel on hire again in such position and at such time as the vessel may again in all respects be ready to comply with the orders and directions of the Charterers, provided always to be either same port/position or equidistant.

The Charterers may in their option, at any time, add to the Time Charter Party period, partly or wholly any off-hire period(s).  The rate of hire for any such added period(s) shall be paid at the same rate as that applicable during the off-hire period(s).

**HOWE ROBINSON**                    2

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

**Clause 35 continued**

During any off-hire period estimated to exceed 15 days, the Owners to give the Charterers not less than 3 (three) days definite notice of resumption of the service.

If the vessel has been off-hire for a period of 20 (twenty) consecutive days during this Charter Party, the Charterers shall have the option to cancel this Charter Party and redeliver the vessel, on dropping last outward sea pilot station of last discharging port of occurrence.

**Clause 36**

Normal quarantine and expenses to enter the port to be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness etc of Master, officers and crew, to be for Owner's account.

**Clause 37     Gear Breakdown**

In the event of partial or total breakdown and/or unavailability of ship's cranes, which is not caused by shore labour the hire to be reduced pro rata for the period of such breakdown and/or unavailability in relation to the number of vessel's working cranes.

If Charterers, in their option, continue work on hatch or hatches affected by breakdown by hiring shore appliances, Owners are to pay for shore appliances but in such case Charterers are to pay full hire for all time shore appliances working. The vessel is however to be pro-rata off hire if shore cranes are not available during stoppage of crane(s). Any stevedoring charges additionally accruing due to breakdown of vessel's equipment, including cost for standby of stevedores, upto end of the shift, unless gangs have already been ordered and are unable to cancelled to be for Owners' account. But if Charterers have sufficient time to cancel additional shift then they will do so in which case costs for standby of stevedore charges upto maximum 1 shift only

**Clause 38     Readiness**

On arrival at first load port vessel's holds to be swept, fresh water washed and cleaned, dry and free of all remains of previous cargo and loose rust and scale, free of infestation to a mutually appointed independent surveyor's satisfaction, and fit in every way to receive and carry any cargo under this Charter Party.  If vessel fails to pass hold inspection as above the vessel should placed pro-rata off-hire according to the number of failed holds only and as from the time of rejection until the vessel passes the same inspection  provided that time is actually lost to Charterers due to holds' failure. If vessel is forced off the berth due to unclean holds then all time and proven costs including shore labour but upto maximum one shift to be for Owners account.

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

**Clause 39       Certificates/Vaccinations**

Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with all the required up-to-date and valid international trading certificates, enabling the vessel and her crew to load, carry and discharge all cargoes permitted under this Charter Party, and to call at all ports for cargo operations and/or to receive bunkers within the trading limits of this Charter Party.

It is the responsibility of the Master and the Owners to arrange for any special vaccination required at ports of call and to keep on board corresponding valid certificates.

If Owners fail to comply herewith, any time lost and all directly related extra expenses to be for Owner's account and Charterers may deduct same from hire.

**Clause 40       Surveys**

Joint on/off hire surveys to be carried out by a mutually appointed independent surveyor.

As on-hire survey shall be conducted in Charterers' time and at joint expense. An off-hire survey, if required by the master/Owners, shall be conducted in the Owners' time and at joint expense.

Costs to be shared 50/50.

Any time lost at load to be for Charterers' account and any time lost at discharge to be for Owners' account.

**Clause 41**

In the event of loading steels, pre-loading survey is to be carried out by Owners' P and I Club surveyors at Charterers' expense.

Master is at liberty to insert Owners' P and I Club surveyor's remarks on Mate's receipts and consequently in the Bills of Lading.

**Clause 42       International Tonnage Certificate**

Upon delivery, the vessel shall have on board an International Tonnage Certificate valid for the duration of this Charter Party and such Tonnage Certificate shall be acceptable by the local authorities at the countries of call within the trading limits of this Charter Party. Should such certificate not be acceptable to the local authorities, any time lost and all extra direct, proven and duly supported by vouchers expenses for issuing an acceptable certificate are to be for Owners' account.

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

**Clause 43      I.T.F/Flag Restrictions etc**

Owners warrant that the officers and crew of the vessel are covered for the duration of the Charter Party under terms and conditions of employment that are equivalent to International standards. Loss of time and extra expenses incurred as a result of non-compliance shall be for Owners' account and may be deducted from hire.

The Owners are responsible for any loss of time or delay or restriction to the full working of the vessel resulting from any action that may be taken against the ship by third parties for any reason that the Owners are responsible, including terms and conditions of employment of officers and crew.

**Clause 44      Oil Pollution**

Notwithstanding any terms or conditions stated elsewhere in this Charter Party, it is warranted that during the currency of this Charter Owners will comply fully with any legislation enacted with respect to oil or other pollution (such expression to include any rules and/or regulations issued thereunder) by any government including federal, state or municipal or other division or authority thereof.) In particular Owners to establish and maintain at their expense such financial security or responsibility in respect of oil or other pollution damage as may be required by any such legislation. Should any delay to the vessel or any extension of the voyage occur from failure of Owners to comply with such oil or other pollution legislation, the vessel is to be considered off-hire for the period of such delay. Owners hereby accept responsibility for all the direct consequences and agree to indemnify Charterers against all claims, liabilities and costs (including Charterers' legal fees) which result from Owners' failure to comply full with such oil or other pollution legislation.

**Clause 45      P and I Club/Cargo Claims**

Owners confirm that the vessel is entered and shall remain entered in a Protection and Indemnity Association for the duration of this Charter Party. Entry shall include, but not be limited to, full cover for cargo claims of any nature and Owner's liability for personal accidents or injuries incurred by third parties on board or about the vessel provided is due to the ship's default or negligence.

Vessel is presently entered with North of England.

**Clause 46      Claims**

Any cargo claim to be settled in accordance with the Interclub N.Y.P.E. Agreement 1994 with amendments to date.

**Clause 47**

Deleted.

M.V. "NATS EMPEROR"
## CHARTER PARTY DATED 29TH FEBRUARY, 2008
### ADDITIONAL CLAUSES

**Clause 48    Trading Exclusions**

Turkish Occupied Cyprus (Turkish occupied Cyprus), Lebanon, Syria, Israel, Georgia
including Abkhazia, Sea of Azov, Denmark, Norway, Sweden, Finland, Iceland,
Yemen / People Republic of Yemen (North and South Yemen), Iraq, Cambodia,
North Korea, CIS Pacific, Australia, New Zealand, Tasmania, Sierra Leone,
Mauritania, Liberia, Ethiopia, Somalia, Turkey, Eritrea, Democratic Republic of
Congo (Formerly Zaire), Cuba, Haiti, Great Lakes, all Asian Gypsy moth high-risk
ports as defined by USDA, APHI, PPQ, all war or war like zones, all boycotted
countries By U.N., all war risk countries as defined by vessel's War Risk underwriters
and all ice bound ports. Vessel neither to be obliged to force ice nor to follow an ice
breaker. trading always within Institute Warranty Limits.

Trading always within Institute Warranty Limits Charterers' option to break Institute
Warranty Limits subject obtaining first Owners' approval and subject to underwriters'
approval against paying additional premium on hull and machinery according to
vouchers from underwriters' showing additional premium net of all rebates.


**Clause 49    War Risk Insurance**

Premium for annual War Risk Insurance on hull and machinery and officer/crew
always to be for Owners' account. Any additional premium for vessel in respect of
these risks solely arising from the vessel proceeding at the Charterers' request to areas
designated as excluded areas by vessel's War Risks Underwriters to be for the
Charterers' account, however, this charge would be reference with quoted charged on
London market officers and crew additional war risk premium to be for Charterers'
account. Any additional crew war bonus and blocking and trapping as imposed by
War Risk Underwriters same to be for Charterers' account and to be paid to Owners
on production of Underwriter, original vouchers. Master has the right not to call
actual war countries in this Charter Party.

**Clause 50    Weather Routing Clause to apply.**

Charterers may supply Marincom news advice to the Master, during voyages
specified by the Charterers. The Master to comply with the reporting procedures of
the routing company selected by Charterers.

However if Master has reasons to believe due to prevailing conditions that ocean
routes advice will put the vessel and her crew into danger, he has the liberty to take
the final decision. the vessel shall be capable at all times during the currency of this
Charter Party, to maintain that speed and daily fuel consumption as specified in
vessel's description in good weather conditions.

Evidence of weather conditions to be taken from the vessel's deck log books and
Independent Weather Bureau Reports. In the event of consistent discrepancy between
the deck logs and the Independent Weather Bureau Report both parties should try to
settle the matter amicably.


**HOWE ROBINSON**                6

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

**Clause 50 continued**

However, no amount to be deducted from hire in regards of vessel's speed underperformance for any reason prior vessel's redelivery unless Charterers getting Owners' consent to do so or arbitrary decision comes into Charterers' favour.

**Clause 51**

Deleted.

**Clause 52        Cargo Exclusions**

All dangerous explosive, combustible, injurious, toxic, corrosive inflammable goods and all IMO cargoes.

Acids, aggregates, aluminium smelting by-products, aluminium silicon powder, all nitrates including ammonium nitrate, ammonium sulphate, ammonium chlorine, ammunition, arms, asbestos goods, ashes, asphalt, bank notes or other negotiable instruments, barium nitrate, borax, bleaching powder, bitumen bauxite, bones, bullion, bombs, black powder, blasting caps.

Calcium carbide, calcium chloride, calcium oxychloride, calcium hypochlorite, (including all products that are/or contain or are related to calcium hypochlorides), caporit, chloride of lime, chlorinated lime, hy-chlor, camping caravans, canary seed, carbide, caustic soda, caustic potash, potash, clay, chrome cake, concentrates, carbon black in bulk, castor seed, castor beans, cement clinker, cement, charcoal, charcoal in gunny bags, clay, containers, copra pellets, copra and copra products, cotton, coffee, cocoa, creosoted goods, chilean nitrate, damaged or second-hand goods, dangerous injurious and inflammable goods, dichlorphenol, direct reduced iron ore/pellets, detonators, detonator caps, dynamite.

Esparto, expellers, explosives, ferrosilicon, fibres, fishmeal, ferrophosphorous including briquettes, ferrous metal borings (shavings, turnings, or cuttings), fireworks. granite, glass, gluten feed pellets ground nuts, gypsum, H.B.I, hemp, hides, hot and cold moulded briquettes, iron briquettes, iron oxide, iron sponge, iron pellets jute, livestock, lead nitrate, lime, lime chloride, logs, locomotives. Manioc and manioc pellets, military equipment, magnesia (unslaked), magnesium nitrate, metal sulphide concentrates, mineral sands, mono ammonium phosphate, motor blocks, manganese silicon, motor spirit, motor vehicles, mobile homes.

Naphtha, nefeline, nitro-glycerine, niger seeds/nigerseed expellers, NPK, nuclear and radioactive materials or products or their waste, oil Cakes.

Pencil pitch, petcoke and its products, petroleum coke (calcined or uncalcined petroleum and its liquid derivatives/products), pitch, prefabricated and mobile buildings, peat moss, potassium chloride, potassium nitrate palm kernals, pesticides, pollard pellets. quebracho and extracts, quicklime rails, rice bagged or bulk, rice bran, railway wagons, rare metals and precious objects, raw vegetables or fruit, resin,

**HOWE ROBINSON**                7

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

**Clause 52 continued**

rutille, rockets, radio active and /or nuclear materials and waste, radio isotopes, salt, saltpetre, scrap of any kind, silicon manganese, silicon, soda ash, sodium nitrate, sodium sulphate, sulphur, sunflower seeds, seeds of any kind, seed expellers, seedcakes and expellers swarf, sawdust, sulphate in bulk, sludge ores, slurry, syanite ore pellets, sands and all kind of sands, sponge iron tar, tobacco. TNT, toxic or chemical waste, trailers, turnings, turpentine pipes with unprotected ends, war material of any kind, wheatflour, wheat bran. Yachts, zinc, ash goods or substances listed in the IMO-IMDG code 1994 consolidation edition and subsequent edition thereof or amendments thereto.

For the carriage of coal all extra fittings/equipments for Charterers account/expense. All cargo carried to comply with latest IMO and local regulations.

In addition:

Charterers are allowed to load aggregates once during the period of charter.

Charterers are also permitted to load concentrates in which case following Protective Clause to be inserted:

1.  Prior to commencement of loading, Charterers/shippers are to provide laboratory analysis/certificate evidencing such cargo that both the flow moisture point and moisture content and transportable moisture limit of such cargo (compliance with) are within the limit as set out by latest IMO regulation.
2.  At Master's request, Charterers to allow Owners to appoint P and I surveyor or independent (mutually agreed) surveyor to supervise loading, stowing, execution of separation, trimming, etc., to surveyor's agreement and Master's satisfaction at Charterers' time and expenses.
3.  For loading concentrates the stowage to be within vessel's stability and strength permitting. All necessary separation (if required) to be properly erected up to surveyor's and Master's satisfaction at Charterers' expenses and time and such cargo to be loaded/stowed/separated/trimmed and discharged etc. Strictly according to latest IMO and other (authorities) regulations/rules applicable to such cargo.
4.  It is understood that loading terms for loading concentrates to be weather working days. During loading, Master has the right to stop loading and close the hatches of rains affect concentrates moisture content. Any such stoppage is not considered to be off-hire under this Charter Party.
5.  After loading, cargo must properly trimmed and/or levelled, Charterers undertake to arrange for special extra trimming and/or levelling of the cargo to satisfaction of master and independent surveyor at Charterers'/shipper expense and time.

HOWE ROBINSON                    8

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

Clause 52 continued

6.    Any (directly related) extra expenses resultant therefrom/incurred
       thereby (such as any delays, damages, hold cleaning to Master's
       satisfaction, hold survey, claims consequential losses of
       whatsoever nature and however arising as a result of loading and carrying
       concentrates) and any detention through any of the above caused shall be for
       Charterers' account.

Furthermore, Charterers have the option to load once cargo of petcoke during the
currency of this c/p provided not to be the last cargo and Charterers to provide
Owners with full details of duration of such trip. Time Charterers will undertake at
their arrangements, time and expenses the preparation of the holds.

Owners/vessel will not be responsible if holds will not pass relevant inspection by
shippers or other and vessel remain on full hire. Further to above the cargo of calcined
or green delayed petcoke will not be as last cargo prior to redelivery. In addition time
Charterers after discharging the calcined or green-delayed petcoke are to clean the
holds at their own arrangements including chemicals and other products necessary for
the cleanliness of cargo, expenses and time, and vessel to remain on full hire.

The cleanliness of the holds to be verified by independent surveyors appointed by
both parties and each party covering its own expenses. If required by Charterers, crew
to perform the cleaning of holds at best of their capabilities and Charterers to pay
USD 1500 per hold to the Owners but Owners and/or crew not to be held responsible
for any/all consequences, damages, costs or liabilities arising from such hold
cleanliness test and/or failure to conform shipper's cargo surveyor's standard, etc,
whatsoever.

Charterers are also allowed to carry sulphur in which case following Lime-Washing
Clause shall apply:
"Limewashing to be arranged prior to commencement of loading at Charterers' time,
risk and expense to master's satisfaction. Charterers to provide all lime and necessary
equipment. Crew to apply such limewash - provided is permitted by local and
union regulations - Charterers to pay $ 1000 per hold for such limewash
Excluding all needed materials.

In case of holds being limewashed if the next cargo requires holds to be
cleaned of limewash, then same to be completely removed be vessel's crew to
Master's satisfaction after completion of discharge and prior to loading of next cargo
at Charterers' time, risk and expense,  Charterers to pay $ 1000 per hold for such
limewash excluding all needed materials.

Charterers to give Owners as much notice as possible in case intention to load sulphur
and always subject to class approval.

HOWE ROBINSON                    9

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

Clause 53    Deck Cargo

No cargo on deck is allowed to be loaded.

Clause 54    Bunkers

Vessel to be delivered to Charterers with bunkers as onboard (estimated to be about 900 metric tons ifo and about 55 metric tons mdo) and to be redelivered with about same quantities as actually onboard at the time of delivery.

Value of bunkers on delivery to be paid to Owners by Charterers along with first 15 days hire payment and Charterers to have the option to deduct value of estimated bunkers on redelivery from last hire payment/payments.

Owners to have the right to supply bunkers for their own account during the currency of this Charter Party, which to remain Owners' property. However without intervening with Charterers loading or discharging operations.

Prices applicable both ends: USD500 per metric ton of ifo and USD 750 per metric ton of mdo. Differences between the bunker quantities on delivery and redelivery to be settled along with the final hire statement.

(a)    Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-clause (a).

(b)    Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-clause

HOWE ROBINSON                    10

**M.V. "NATS EMPEROR"**
**CHARTER PARTY DATED 29TH FEBRUARY, 2008**
**ADDITIONAL CLAUSES**

**Clause 54 continued**

(a),    the Owners warrant that:

(i)     the vessel shall comply with regulations 14 and 18 of Marpol Annex
        VI and  with the requirements of any emission control zone; and

(ii)    the vessel shall be able to consume fuels of the required sulphur
        content  when ordered by the Charterers to trade within any such zone.

        Subject to having supplied the vessel with fuels in accordance with
        sub-clause

(a),    the Charterers shall not otherwise be liable for any loss,
        delay, fines, costs or expenses arising or resulting from the
        vessel's failure to comply with regulations 14 and 18 of
        Marpol Annex VI.

(c)     for the purpose of this clause, "emission control zone" shall
        mean  zones as stipulated in Marpol Annex VI and/or zones regulated
        by regional and/or national authorities such as, but not
        limited to, the E.U. and the US environmental protection agency.

As on-hire survey shall be conducted in Charterers' time and at joint  expense. An off-
hire survey, if required by the Master/Owners, shall be conducted in the Owners' time
and at joint expense.

**Clause 55    Vessel's Performance**

Charterers to have the option to track the position of the vessel via vessel's polling
services provided by weathernews.  Prior to redelivery Owners to furnish Charterers
with full details of vessel.

**Clause 56    Master's/Crew's Assistance**

With reference to Clause 8 of this Charter Party, hire to include "customary
assistance" which shall mean all types of work which the Master and the crew would
normally do when the ship is trading for the Owners' account provided that all or part

of such works are permitted by port authority and/or local labour regulations such as,
but not limited to:

a.      Raising and  lowering and rigging derricks/cranes and/or gangways in
        preparation for loading and discharging.

b.      First opening and last closing of hatches in connection with loading and
        discharging, if local regulations permitting.

**HOWE ROBINSON**           11

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

**Clause 56 continued**

c.     Deleted.

d.     Customary supervisions of loading and discharging. Master to supervise the stowage of the vessel insofar as this concerns the trim and/or stability of the vessel. It is clearly understood this does not reflect upon or change the appointment of liability under the Interclub Agreement which to remain wholly unchanged.

e.     Maintaining sufficient steam/electric power and all cranes in good order whilst loading and discharging including regular maintenance of derricks/cranes.

f.     Shifting vessel during loading and discharging and shifting berth.

g.     Docking and undocking.

h.     Bunkering.

i.     Weather permitting Officers and Crew to shape up vessel's hatches and derricks/cranes as much as possible prior to arrival at loading and/or discharging ports or places so as to immediately commence loading and/or discharging operations.

The Master shall keep a record of all large gear or equipment supplied by Charterers and maintain same in good condition. Such gear or equipment to be returned to Charterers prior to redelivery or at any time requested prior redelivery. Master not to be held responsible for small items such as lashing materials/turnbuckles etc. Master will be instructed by Head Owners' offices to pay close attention to Charterers' lashing materials.

**Clause 57     Hatch Covers**

Vessel's hatch covers are and remain during the currency of this Charter Party in good proper condition, totally water tight/weather tight. Any time lost and/or expenses incurred as the result of hatch covers not being weather/water tight to be for the Owner's account.

**Clause 58     Bills of Lading**

In case original Bills of Lading are not available at discharge ports, Owners to release cargo against Charterers' Letter of Indemnity in Owners' standard Protection and Indemnity Club wording, signed and stamped by Charterers officer binding the company. The Charterers' Letter of Indemnity will be first sent by fax during working hours in Greece and shall accompanied by true photocopies of original Bills of Lading or cargo manifests. Original Letter of Indemnity to follow by post/courier mail.

HOWE ROBINSON                    12

## M.V. "NATS EMPEROR"
### CHARTER PARTY DATED 29TH FEBRUARY, 2008
### ADDITIONAL CLAUSES

**Clause 58 continued**

Charterers or their agents are herewith authorised to issue and sign Bill(s) of Lading and presented on Owners'/Masters' behalf in strict conformity with mate's receipts without prejudice and/or reference to this Charter Party. Master to advise Charterers directly of any notation made on mate's receipt. Charterers to indemnify Owners against all consequences incurred to the vessel or Owners as a result of signing Bill(s) of Lading by the Charterers and/or sub-charterers and/or their agents not being in strict conformity with mate's receipts.

If Liner Bills are issued then agents at both loading and discharging ports to confirm in writing to owners prior to vessels arrival that all liner costs have been paid by Charterers and that no claims can be made against owner.

**Clause 59**

Deleted.

**Clause 60     BIMCO Stevedore Damage Clause**

Any damage caused by stevedores during the currency of this Charter Party shall be reported by the Master to the Charterers or their agents, in writing, within 24 hours of the occurrence or as soon as possible thereafter but latest when the damage could have been discovered by the exercise of due diligence. The Master shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in the meantime.

Hidden damages to be reported as soon as noticed but latest on completion of discharge of the respective hold and in any case prior to redelivery.

Stevedore damage affecting seaworthiness or the proper working of the vessel and/or her equipment, and/or safety of crew shall be arranged for repair by Charterers without delay to the vessel after each occurrence in the Charterers' time and shall be paid for by the Charterers to the satisfaction of vessel's classification society surveyor. Other repairs shall be done at the same time, but if this is not possible, same shall be repaired whilst vessel is in drydock in the Owner's time, provided this does not interfere with the Owner's convenience and all proven costs of such repairs shall be for Charterers' account or, in Owner's option, Charterers to compensate Owners for cost of repairs as evaluated by the Independent Off-Hire Surveyor.

**HOWE ROBINSON**                    13

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

**Clause 61        L.M.A.A. Arbitration Clause**

All disputes or differences arising under or in connection with this contract which cannot be amicably resolved shall be referred to arbitration in London.

Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party. In the case of an arbitration on documents, if the two arbitrators so appointed are in agreement their decision shall be final. In all other cases the arbitrators so appointed shall appoint a third arbitrator and the reference shall be to the three-man tribunal thus constituted.

If either of the appointed arbitrators refuses to act or is incapable of acting, the party who appointed him shall appoint a new arbitrator in his place.

If one party fails to appoint an arbitrator, whether originally or by way of substitution for two weeks after the other party, having appointed his arbitrator, has (by telex of letter) called upon the defaulting party to make the appointment, the President for the time being of the London Maritime Arbitrators Association shall, upon application of the other party, appoint an arbitrator on behalf of the defaulting party and that arbitrator shall have the like powers to act in the reference and make an award (and, if the case so requires, the like duty in relation to the appointment of a third arbitrator) as if he had been appointed in accordance with the terms of the agreement.

This contract is governed by English Law and there shall apply to all proceedings under this clause the Terms of the London Maritime Arbitrators Association current at the time when the arbitration proceedings were commenced. All appointees shall be members of the Association.

Provided that where the amount in dispute does not exceed the sum of U.S.$50,000 (Fifty Thousand Dollars) any dispute shall be resolved in accordance with the Small Claims Procedure of the London Maritime Arbitrators' Association.

**Clause 62        Lieu of Cleaning on Redelivery**

The Charterers shall have the option to redeliver the vessel with unclean/unswept holds/deck including creosote stains if any, against a payment of U.S.$5,000 (Five Thousand Dollars) lumpsum including dunnage, / plastic sawdust removal into garbage bins provided by Charterers. Garbage bins then to be removed by Charterers/ It is clearly understood Charterers will pay for shore disposals of all above material (plastic/dunnage/sawdust/everything else left in cargo holds). Cleaning materials for cleaning of any creosote stains if any, to be provided by Charterers at Charterers' expense. In case vessel's discharge port in U.S.A., then all removals from vessel's weather deck to shore place to be for Charterers' account, expenses and time.

HOWE ROBINSON                    14

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

Clause 63       Fittings

Charterers to have the option to weld padeyes but not above fuel oil tanks and/or stanchion sockets and/or other lashing/securing devices/points at their expense and subject to the Master's approval which is not to be unreasonably withheld. Charterers to remove all such padeyes/stanchion sockets and/or other lashing/securing devices/points prior to redelivery. Vessel remaining on hire.

Clause 64       Intermediate Hold Cleaning

During the charter period the crew, in Charterers' option, are to perform ordinary hold cleaning and the Charterers are to pay the amount of USD 500 per hold to the Owners for normal cargo and USD 1,200 for concentrates for each such intermediate hold cleaning operation.

The crew shall endeavour to clean the holds to the best of their capabilities but the Owners and/or crew not to be held responsible for any/all consequences, damages, costs or liabilities (except damages to the vessel) arising from such hold cleaning by the crew including but not limited to failure of hold cleanliness test and/or failure to conform to shippers' cargo surveyor's standards, etc.,

Whatsoever. Such hold cleaning operations can only be done by the crew if local unions or port authorities allow same and if time and weather permit and crew available from their other duties. Charterers are to be responsible for the cost and time for all removals of debris and dunnage.

The Master has the option to refuse such hold cleaning orders if he deems his crew is not able to clean the holds due to the nature and/or dirtiness of the last cargo carried or the nature (including the level of cleanliness required) of the next cargo.

Should the Master refuse such orders then he must substantiate reasonably his reasons for such refusal.

Clause 65       Grabs

Vessel is suitable for grab discharge in all holds.

Clause 66       Safe Ballast

Owners guarantee vessel always to be safe in ballast and it is agreed that if any solid ballast is required, all expense for same including time used in loading and discharging to be for Owners' account.

Clause 67

Deleted.

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

Clause 68     General Average

Hire not to contribute to General Average.

Clause 69     Boycotts

In the event of loss of time, boycott of the vessel or any labour trouble by shore labour, seamen's unions, tugboats, pilots, linesmen, stevedores and local authorities etc., whether official or unofficial, arising by reason of vessel's flag, nationality or registry, her ownership, terms and conditions on which crew members are employed on this or any other vessel under the same ownership and/or operations and/or control, payment of hire shall cease for the time thereby lost.

Clause 70     Customs Fines

Owners to be responsible for customs fines and to put up security in case of necessity if Owner's vessel is proven responsible and if so demanded by local authorities for Owner's matter unless fines imposed to the vessel due to cargoes and/or Charterers and/or sub Charterers and/or their agents omissions or faults in which case any expenses including security if necessary to be provided and paid by Charterers and vessel to remain fully on hire. Any dispute as to ultimate liability arising insofar to be decided according to the terms and conditions of this Charter Party.

Owners to be responsible for any fines whatsoever in the event of smuggling acts by their own officers and/or crew, Owner's passengers and Owners to remain responsible for detention of the vessel due to smuggling and any other expenses arising from these acts. Charterers to be similarly responsible in respect of Charterers' representatives and/or servants.

Clause 71

For the purpose of conducting a draft survey, the vessel must have on board certified calibrated scales for vessel's tanks and double bottoms and capacity plans, displacement scale and deadweight scale and any other documents and information necessary for conducting a draft survey. The vessel's marks fore/aft/midship to be clearly legible.

Clause 72

Only garbage disposal required by vessel/Master to be for Owner's account.

Clause 73     Vessel's Description

All details/figures "about"

Owners warrant the vessel is covered, and will remain so throughout the currency of the Charter Party, with a P and I Club that is a member of the International Group of P and I Clubs. Vessel is entered with West of England Club.

HOWE ROBINSON                    16

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
<u>ADDITIONAL CLAUSES</u>

**Clause 73 continued**

Owners warrant that the vessel is classed, and will remain so throughout the currency of the Charter Party, with a Classification Society that is a member of the International Association of Classification Societies.

**Clause 74**

Only Mate's receipts to be signed at loading port, Owners to confirm that Master is instructed not to hand copy of Mate's receipts to Agents/Receivers at discharge port.

Owners to make allowance for discrepancy between Mate's receipt weight (actual weight) and Bill(s) of Lading weight (theoretical weight) against Charterers' Letter of Indemnity. Freight payment is in any case based on Mate's receipt quantity.

**Clause 75**

All taxes and/or dues on vessel and/or cargo and on Charter hire and freights arising out of cargoes carried or ports visited under this Charter Party shall be for Charterers' account, except taxes levied on vessel's flag and in connection with port of vessel's registry which to be for Owners' account. Canal fee if any always for Charterers' account.

**Clause 76**

Owners have the benefit of Charterers' agents in dealing with vessel's/crew's minor matters in all ports of call without paying agency fee.

**Clause 77    Hamburg Rules**

Neither the Charterers nor their agents shall permit the issue of any Bill of Lading, waybill or other document evidencing a Contract of Carriage (whether or not signed on behalf of the Owners or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of the Hague or Hague-Visby Rules.

The Charterers shall indemnify the Owners against liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

**Clause 78    Redelivery**

Redelivery on dropping outward sea pilot station one safe port Aden / South Japan range including Island or in Charterers' option Key West / Bahia Blanca range including U.S. Gulf plus NCSA but excluding Cuba or in Charterers' option Skaw / Gibraltar range on in Charterers' option. Full Mediterranean including Black Sea but excluding Turkey.

**HOWE ROBINSON**                17

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

Clause 79     Stowaway clause for Time Charters

(a)     (I) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(II) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.  Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the vessel shall remain on hire.

(III) Should the vessel be arrested as a result of the Charterers breach of charter according to sub-clause (a)(II) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

(b)     (I) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the vessel shall be off-hire.

(II) Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

Clause 80     Description

M/V 'NATS EMPEROR'
================================
1. DWAT          : 37.916 MT
2. DRAFT SSW     : 11.80 M
3. BUILT         : 9/1987
4. FLAG          : CYPRUS
5. CALL SIGN     : P3XL8
6. LOA / BEAM    : 193.45 / 26.25
7. GRT / NRT     : 22.540 / 13.020
   PANAMA GRT/NRT: 24.189 MT/18.347 MT
8. MOULD DEPTH   : 16.07 M
9. LBP           : 181.36 M
10. CLASS        : G.L. HIGHEST
                   (HOLDS 3-5 MAY BE EMPTY)

HOWE ROBINSON          18

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

**Clause 80 continued**

11. ENGINE/BRIDGE : ALL AFT
12. DECKS         : SINGLE DECKER
13. HO/HA         : 6/6
14. HA COVERS     : HYDRAULIC FOLDING TYPE
15. HA SIZES      : NO 1: 18.7 M X 14.02 M
                    NO 2+3+4+5+6: 17.02 X 14.02 M
16. HOLDS DIMNS   : TANK TOP: 24.60 M L X 7.60 M BEAM FORE AND
                    18.50 M BEAM AFT - NO 2+3+4+5+6: 21 M X 18.50 M
                    HEIGHTS: ALL 14.5 M
17. GRAIN         : 46.696 CBM (1.649.000 CBFT)
18. STRENGTHS     : 1-2-4-6/21.5//3-5/15.6//H.C. 2.8//D. 3.35
19. P + I         : NORTH OF ENGLAND.
20. HOLDS VENT    : ELECTRICAL/NATURAL
21. CO2 FITTED    : YES
22. ICE CLASS     : YES
23. GRAIN FITTED  : YES
24. CARGO GEAR    : 4 CRANES X 25 MT SWL ELECTR/HYDR
25. SPEED/CONS    : AB T 13 KNOTS ON ABT 26 MT IFO 180 CST PLUS ABT
2 MT MDO AT SEA BASIS UPTO BEAUFORT FORCE 4
+ ABT 2 MT MDO WHEN IDLE + ABT 3.5 MT MDO WHEN CRANES
WORKING.
WHEN VENTILATIONS WORKING THEN ABT 2.6 MTNS MDO WHEN IDLE
OR AT SEA.
VESSEL WHEN ENTERING/SAILING, NAVIGATING PORTS, RIVERS,
NARROW WATERS CONSUMES MDO.

BUNKERS SPECIFICATIONS: IFO 180 CST OF QUALITY RME 25  AND MDO
WITH MAX SULPHUR CONTENT NOT TO EXCEED 1.5 PCT.

26. B'DOWN OF CBFT:
        NO 1)  8427.90 / 7661.60
        NO 2)  7794.10 / 7273.60
        NO 3)  7733.60 / 7265.00
        NO 4)  7671.40 / 7156.60
        NO 5)  7731.40 / 7263.80
        NO 6)  7337.70 / 7008.40
27. TPC           : 41 MT
28. CONST         : 350 MT EXCL FRESH WATER
29. FR. WATER CAP.: 195 MT BASIS FULL

ALL DETAILS ABOUT AND GIVEN IN GOOD FAITH

HOWE ROBINSON                19

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

Clause 81    Hull Cleaning Operation due to prolonged
             vessel's stay at port

If the vessel is encountering stay for more than 28 days in tropical water and
there is strong reason to believe that the vessel's speed/consumption due to the stay at
this specific port, owners are to arrange for a diver inspection provided port's
availability of facilities (diver inspection and bottom cleaning service operation),
otherwise vessel's hull to be inspected/cleaned at the next port of call with such
available facilities but Owners shall not be responsible for any time lost arising
therefrom between the two ports.

Should the result of this diver inspection indicate there is excessive marine
growth on the hull, Charterers to arrange underwater scrubbing of the
hull in Charterers' time and expense, prior to vessel's departure from the
port, if same can be done without reasonable delay. If the underwater
scrubbing is not available or can not be carried out at the port in question same
to be carried out in Charterers' time in the next convenient port.

Charterers agree no claim for underperformance of the vessel for the passage
from the port in question until water scrubbing is carried out.

Clause 82    DPC Port State Control Inspection Clause

This clause is referring to recent changes to port state control inspections for vessels
calling at Brazilian ports.

Vessels over 18 year of built, loading iron ore or other bulk cargoes which
density are in excess of 1,78 mt/m3 must undergo a structural condition
survey, done by a classification society on behalf of the Brazilian Navy's
Bureau of ports and coasts (DPC). Such inspection to be for Charterers' account, time
and expenses and vessel shall remain fully on-hire.

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

### BIMCO STANDARD ISM CLAUSE FOR VOYAGE AND TIME CHARTER PARTIES

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirements of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for the Owners' account.

### BIMCO STANDARD YEAR 2000 CLAUSE FOR VOYAGE AND TIME CHARTER PARTIES

"Year 2000" conformity shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the Year 2000.

Without prejudice to their other rights, obligations and defences under this Charter Party including where applicable, those of the Hague or Hague-Visby Rules, the Owners and the Charterers, and in particular the Owners in respect of the vessel, shall exercise due diligence in ensuring the Year 2000 conformity in so far as this has a bearing on the performance of this Charter Party.

The vessel, the Owners, the Management and the Registration are in compliance with the 'Year 2000 Clause' throughout the duration of the whole charter and at any port of call.

### CONWARTIME 1993

1.      For the purpose of this Clause, the words:

        (a)     "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the vessel, and the Master; and

HOWE ROBINSON                   21

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

(b)     "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2.      The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3.      The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or Ownership, or against certain cargoes or crews otherwise howsoever, or to proceed to an area where she shall be subject or is likely to be subject to a belligerent's right of search and/or confiscation.

4.  (a)     The Owners may effect war risks insurance in respect of Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks) and the premiums and/or calls thereof shall be for their account.

(b)     If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5.      If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

HOWE ROBINSON                   22

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

6.    The vessel shall have liberty:

(a)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b)    to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c)    to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d)    to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

(e)    to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7.    If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging port, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8.    If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable accordingly to the York/Antwerp Rules 1994, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:-

HOWE ROBINSON            23

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

### NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers.  Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery".

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

### GENERAL PARAMOUNT CLAUSE

All the Bills of Lading issued under this Charter Party shall contain the following clause:

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea incorporates the rules relating to Bills of Lading contained in the international convention, dated Brussels, 25th August 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such terms shall be void to that extent but no further.  Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability.

### NEW BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

HOWE ROBINSON          24

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

## BOTH-TO-BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## ISPS CLAUSE FOR TIME CHARTER PARTIES

(a)
(i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)
(i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

HOWE ROBINSON                    25

M.V. "NATS EMPEROR"
CHARTER PARTY DATED 29TH FEBRUARY, 2008
ADDITIONAL CLAUSES

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)
Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)
If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

HOWE ROBINSON                    26

Adapted 1992

**ALANSONS SHIPPING LTD, CHARTER HOUSE, 117 GREENSTEAD ROAD, COLCHESTER, ESSEX, CO1 2ST**
Tel: 01206 871919 Fax: 01206 871901 e-mail: chartering@alansons.net or postfixture@alansons.net

# GENFERT
## GENERAL PURPOSE FERTILIZER CHARTER PARTY

|  |  |  |
|---|---|---|
| | London ...*27ᵗʰ March, 2008*.................. | 1 |
| | It is this Day mutually agreed between ...*Hawkeel Ltd, London as Disponent*............. | 2 |
| **Owners** | Owners of the ...*Single Deck*..................M.V. ..."*NATS EMPEROR*".......................... | 3 |
| **Vessels** | of ...*37,916 metric*.............. [*summer*] tons deadweight, classed ...*G.L. Highest*.......... | 4 |
| **Position** | now ...*spot off China / Taiwan*.................................. and expected ready to load under this Charter | 5 |
| **Charterers** | on or about ...*30/31ˢᵗ March*..................................... and.......................... | 6 |
| | ...*ConAgra International Ferdlizer Co., Savannah, Georgia, U.S.A.,*.......................as Charterers: | 7 |
| | Unless otherwise specified, whenever the terms "ton" or "tons" appear in this Charter Party, it is deemed to mean a metric ton of 1,000 Kilos. | 8<br>9 |

| | | |
|---|---|---|
| **Loading Port** | **1.** That the said vessel being tight, staunch, strong and in every way fit to carry the cargo shall | 10 |
| | proceed to ...*1-2 safe berth(s)/anchorage(s) Each Qinhuangdao plus Yantai, China, in this rotation* | 11 |
| | ........................................................................................ [sole] .................. | 12 |
| | or so near thereto as she may safely get and lie always afloat and there load a ~~full/part~~ cargo in bulk | 13 |
| **Cargo** | and/or bags of ...*30,000 metric tons minimum upto 31,700 metric tons maximum in Owners' option of* | 14 |
| | *Urea in bulk stowing maximum 52' per metric ton. Owners to declare actual cargo quantity required* | 15 |
| | *along with stowage plan and hold loading order upon fixing main terms. Expected load 31,700 metric* | 16 |
| | *tons. Charterers option 50 metric tons less on Owners' declared quantity.*................................. | 17 |
| **Destination** | which the Charterers bind themselves to ship, and being so loaded, the Vessel shall proceed to : | 18 |
| | ...*1-2 safe berth(s)/anchorage(s) VIZAG, INDIA*.................................... | 19 |
| | ........................................................................................... | 20 |
| | ~~as ordered on signing Bills of Lading,~~ or so near thereto as she may safely get and lie always afloat | 21 |
| | and there deliver the cargo. | 22 |

*via Suez canal*

| | | |
|---|---|---|
| **Freight** | **2.** Freight shall be paid upon the Bill of Lading quantity as follows ...*US$ 57.00 per metric ton* | 23 |
| | *basis 1-1. All freight basis F.I.O. spout/bucket/grab/railcar trimmed (See clause 45)*.................. | 24 |
| *95% (ninety five)* | ................................................. [3] .......................... | 25 |
| | ~~95% (ninety)~~ percent payable within 5 banking days of signing and releasing Bills of Lading less | 26 |
| *or deadfreight, if any* | ~~commissions and estimated despatch at loading port.~~ Charterers shall pay the balance less despatch, | 27 |
| | or plus demurrage, upon agreement of Owners final freight account which to be tendered together | 28 |
| | with supporting documents. *Freight deemed earned on completion of loading  cargo discountless and,* | 29 |
| | *non-returnable  ship &/or cargo lost or not lost.* | 29 |
| | To Owners bank as follows ... | 30 |
| | ...*HSBC Bank PLC*.............................................. | 31 |
| | ....*Corporate Investment Banking and Markets Transport, Logistics and Construction*.............. | 32 |
| | ....*Level 19,  8 Canada Square,  London E14 5HQ*.................................... | 33 |
| | ...*USD A/C NO.39545023...IBAN NO. GB44MIDL4051539545023*....................... | 34 |
| | ...*In Favour Of Brobulk LTD.....SWIFT Code : MIDL GB 22*............................ | 35 |

*Marked "Freight Payable as per Charter Party"*

| | | |
|---|---|---|
| *midnight* | **3.** Should the Vessel not arrive at her loading port and be in all respects ready to load under this | 36 |
| **Laydays and Cancelling** | Charter on or before ~~noon~~ local time .........*4ᵗʰ April, 2008*................ | 37 |
| | the Charterers have the option of cancelling this Charter, to be declared not later than 12 hours after | 38 |
| | the Vessel gives Notice of Readiness in accordance with Clause 10. Laydays not to commence before | 39 |
| | .........*noon 30ᵗʰ March, 2008*.............. Unless with the written consent of Charterers. | 40 |

③

Wed Apr 16 11:19:14 2008                    0                              Page: 1

JPMorgan Chase Bank, N.A.
US DOLLAR FUNDS TRANSFER TRANSACTION RECORD
COPY

------------------------------------------------------------------------

TRANSACTION DETAILS

Transaction Date:  08-APR-08

Amount:  $1558233.76 USD

Debit Acct Number:                     Credit Acct Number:
9102551737                             544713631

Debit Acct Name                        Credit Acct Name
and Address:                           and Address:

OMAHA CONAGRA                          HSBC BANK PLC
MAIL STOP 90-190                       LEVEL 27
3645 N 90TH                            8 CANADA SQ
OMAHA NE 68134-                        LONDON E14 5HQ UNITED KINGDOM

Transaction Type:  Book Transfer

JPMorganChase Transaction  3626800099JO
Reference Number:

Details of Payment:
CONAGRA FREIGHT CP DD 27 MAR 08    X6174

Bank to Bank Information:

------------------------------------------------------------------------

ADDITIONAL PARTIES

Third Party ID,                        Fourth Party ID
Name and Address:                      Name and Address:

/39545023
BROBULK LTD

Order Party Name                       Order Bank Name
and Address:                           and Address:

                                                                     (T)

APR-16-2008  09:22                                              P.001

Wed Apr 16 11:17:12 2008                    0                              Page: 1

JPMorgan Chase Bank, N.A.
US DOLLAR FUNDS TRANSFER TRANSACTION RECORD
COPY
------------------------------------------------------------------------

TRANSACTION DETAILS

Transaction Date:   10-APR-08

Amount:  $67977.78 USD

Debit Acct Number:                    Credit Acct Number:
9102551737                            544713631

Debit Acct Name                       Credit Acct Name
and Address:                          and Address:

OMAHA CONAGRA                         HSBC BANK PLC
MAIL STOP 90-190                      LEVEL 27
5645 N 90TH                           8 CANADA SQ
OMAHA NE 68134-                       LONDON E14 5HQ UNITED KINGDOM

Transaction Type:   Book Transfer

JPMorganChase Transaction    3829800101JO
Reference Number:

Details of Payment:
CONAGRA FREIGHT CP DD 27 MAR 08    X6174


Bank to Bank Information:


------------------------------------------------------------------------
--

ADDITIONAL PARTIES

Third Party ID,                       Fourth Party ID
Name and Address:                     Name and Address:

/39545023
BROBULK LTD



Order Party Name                      Order Bank Name
and Address:                          and Address:

                                                                    (T)

APR-16-2008  09:20                                          P.001

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

------------------------------------------------------------------------X

NATS EMPEROR SHIPPING LIMITED        :

                                         :      08 Civ. 3763 (BSJ)

                       Plaintiff, :

                                         :

- against -                             :

                                         :

HAWKNET LIMITED and BROBULK LIMITED   :

                                       :

                     Defendants.      :

------------------------------------------------------------------------X

## DECLARATION OF JOHN HICKS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE MOTION TO VACATE THE ATTACHMENT AGAINST THE DEFENDANTS' PROPERTY

I, John Hicks, declare under penalty of perjury of the laws of the United States of America as follows:-

1. I am the Senior Partner of Waterson Hicks and the Plaintiff's London solicitors. I make this Declaration in response to the Motion of the Defendant Brobulk.

2. At the time the application for maritime attachment was filed little was known about the reasons why Brobulk was collecting freight which should have been paid to Hawknet. Following the first Meeting of the Creditors of Hawknet on 6th May the position is apparently now a little more clear. Nonetheless in my submission it is evident that Brobulk was used as a vehicle to perpetuate a fraud, one of the criteria which the Defendants themselves recognise justifies the continuation of the order of maritime attachment.

3. I attach as Annex 1 the report of Mr. Walker, Director of Hawknet, which was delivered to the Creditors' Meeting. It will be seen that Hawknet made a loss of US$1,500,000 out of the bankruptcy of a Charterer Eastern Bridge in early 2007. The company was then further hugely exposed by a two year zinc concentrate contract negotiated in December 2006 shortly before the market freight rates rose in early 2007. The increase in the freight rates meant Hawknet could not afford to perform the contract. The zinc concentrate contract was with Zinifex Century Limited who it will be seen are shown in the list of unsecured creditors as owed an amount of £18,007,768, approximately US$35,000,000. Mr. Walker told the Creditor's Meeting that shipments under this contract were ended in October 2007. It was therefore obvious from at least that time, and I submit some months prior to then, that Hawknet faced an enormous claim which it was unlikely ever to be able to meet.

4. It will be seen from the final paragraph of the first page of the Director's Report the company's Bankers (who Mr. Walker disclosed were Royal Bank of Scotland) reduced their facilities to zero. He told the Creditor's Meeting that RBS insisted on the facility being reduced with effect from October 2007. He also told the meeting that Hawknet had no orthodox form of funding available to it from that time which is what led Hawknet to

1

alleged overvalue expressed in the agreement with Brobulk whereby Brobulk advanced short term funding on behalf of Hawknet.

5.  Since Hawknet had no further bank overdraft facility available it had no orthodox means of paying the bunkers under time charter, ship's agents, freight to shipowners etc.

6.  The Liquidator of Hawknet was unaware of the Brobulk transactions, the details of these only arising upon questioning Mr. Walker at the Creditor's Meeting.  He has not been provided with any documents relating to the alleged Brobulk transactions, nor had he the opportunity by the time of the Creditor's Meeting on 6th May to follow through the alleged history of the financial movements arising out of these alleged transactions.   No information was provided to the meeting in respect of the November 2007 transaction which had apparently been broked by Simon Rye of Agriprem, a gentleman and group with whom I have had previous dealings following the bankruptcy of certain of their entities in 2001 which led to shipowners then being left high and dry and exposed to liabilities of Agriprem.

7.  The November 2007 transaction between Brobulk and Hawknet which appears to involve a vessel names "ORIGINATOR" significantly was drawn up in formal language to reflect the importance of the transaction.  Only one message has been disclosed by the Defendants in this respect – the consolidated email of 6th/7th November 2007 - but clearly there is further correspondence connected with the "ORIGINATOR" contract since Brobulk asked for the recap/addendum to be made available to them and copies of the Charterparty between Hawknet and Network Steel and between Hawknet and the Owners of "ORIGINATOR" were also to be attached to the agreement.  This is therefore only a fraction of the documentation available.

8.  Mr. Walker told the Creditor's Meeting of Hawknet that there was no documentation at all available in respect of the arrangements entered into between Hawknet and Brobulk relating to "NATS EMPEROR" and another vessel "TOLMI".  I do not believe this can be true and note from paragraph 10 of the Declaration of Mr. Paulsson that he himself made the later arrangements on the basis they were to follow the original agreement of "ORIGINATOR" "with logical alterations", whatever that may mean since he has not explained what logical alterations were to be implemented.  I suggest that it is inconceivable that Mr. Paulsson will have collected US$4,000,000 otherwise payable to Hawknet and distribute equivalent funds in accordance with the directions of Hawknet without there being a formal agreement and significant correspondence.   Nonetheless the transactions have been concealed from the Liquidator – although Winter Scott on behalf of Brobulk advised my firm on 29th April that full details of the transaction would be provided to the Liquidator, they had not been as at the date of the Creditor's Meeting nor, so far as I am aware, had they been subsequently.  The meeting was told that the transactions were conducted by Brobulk without the knowledge of their parent company, GAC.

9.  Contrary to what is said on behalf of the Defendant there is no evidence that the Hawknet/Brobulk transactions were at arm's length: to the contrary these were clearly not

they involved the collection and movement of millions of Dollars, no documents exist in respect of them.

10. Mr. Paulsson at paragraph 9 of his Declaration states that he understood Hawknet "was undergoing temporary cash flow problems that would be alleviated by these secured loan transaction". I question the basis upon which Mr. Paulsson was able to say this – the transactions were entered into after Hawknet was aware of the US$35,000,000 claim against it by Zinifex and after Hawknet was aware that RBS had withdrawn all orthodox overdraft arrangements. If Mr. Paulsson had made any enquiries at all with Hawknet's Bankers or asked for any documentation to explain the financial position to Hawknet he would have been aware of this. Mr. Paulsson in his Declaration does not explain what enquiries he made in this respect.

11. Further, contrary to what Mr. Paulsson says at paragraph 8(a) of his Declaration, Brobulk not only made payments to Hawknet, it also made a payment directly to Mr. Walker per winter Scott's fax of 25th April, a surprising arrangement in circumstances where he understood that Hawknet had temporary cash flow problems and had two vessels under time charter which had recently loaded cargo and were at sea. The direct effect of Brobulk collecting the subfreights under the subcharters of "NATS EMPEROR" and "TOLMI" was to thwart the attempts by the Owners of "NATS EMPEROR" and "TOLMI" to exercise their contractual rights of lien on those subfreights once Hawknet ceased paying the hire due. Bearing in mind that the freight on "NATS EMPEROR" was paid only some two days before Hawknet went into liquidation (and then only after the Subcharterer had issued a predated Bills of Lading enabling the freight to be paid earlier than it should have been) I suggest the circumstances outlined by the Defendant on page 12 of its Preliminary Statement, namely that once corporation was used by the other to "perpetuate a fraud" appear to arise in the present case. This will be a matter for investigation by the Liquidator in London.

12. In all the circumstances the conduct of Brobulk has been such as to justify the continuation of the Order of Maritime Attachment pending disclosure of further information by Brobulk to the Liquidator in London.

Given this 12th day of May 2008

Signed .......................................................

    John Hicks

# ANNEX 1

# HAWKNET LIMITED
Company Number: 02340237 (E&W)

## MEETING OF CREDITORS
## CONVENED PURSUANT TO SECTION 98
## INSOLVENCY ACT 1986

on

6th MAY 2008

at

6-7 LUDGATE SQUARE
LONDON EC4M 7AS

## Contents

DIRECTORS REPORT

STATEMENT OF AFFAIRS                    Appendix 1

LIST OF UNSECURED CREDITORS            Appendix 2

STATUTORY INFORMATION                  Appendix 3

FINANCIAL INFORMATION                  Appendix 4

DEFICIENCY ACCOUNT                     Appendix 5

Directors Report

Hawknet Ltd was established in 1989. It started as niche market business principally shipping telegraph poles from the USA, Canada, Finland and Sweden to the Mediterranean, Bangladesh and the Philippines. The method of making a living was to consolidate the pole cargoes gaining money from being paid for relatively small cargoes but shipping in larger quantities giving a saving on economy of scale.

By the middle of the 1990's the pole business had reduced considerably partly due to mobile phones and partly due to technical advances reducing the need for telephone poles, and was not sufficient to support the company. The directors therefore expanded the consolidating operation to include other timber products and steels. Hawknet started 'liner' services from the Baltic to the Mediterranean and the Middle East. In 2004 it started a joint venture service with Ethiopian Shipping Lines and ran a monthly service from the Black Sea down the east coast of Africa. From there the ships went down to South Africa where they loaded to the US Gulf and from there back into the Mediterranean.
In 2006 Hawknet started the China / Med Continent service. The Cargoes had changed from almost all timber to almost all steels. The company had become real experts in cargo consolidation. In 2006 Hawknet ran a contract for BHP with concentrates from Chile to the Baltic. The company was steadily growing and poised to really advance.

What went wrong?

In 2007 one of the ships chartered on period, The Enforcer, was sub let to Eastern Bridge, who went out of business. This cost the company 1.5 million usd. It was not the be all and end all. Hawknet was strong enough to absorb the loss and still show a profit March 2007. The bigger problem was that at the end (December) 2006 when a two year contract of Zinc concentrates from Australia to the continent was booked. The shipping market then rose by some 150%. Ships had become a commodity in their own right. Despite good discussions and very fair efforts on behalf of the Charterers the losses could not be stemmed. The freight market had changed. It no longer depended on the amount of cargo in the market but on the future sentiment. In the past taking a ship on period meant one had a reduced rate. If the ship was worked on the open market there was room for a profit. Unfortunately through most of 2007 the period rates were substantially higher than the spot rates. This in effect spelled the end for Hawknet and the way was set up as a cargo operator. The cost of ships rose by so much that the margins that were being made fell far short of the risks of the voyage. Ports for general cargo are still operating much the same way as they did in the 1960's and to have a ship costing 50,000 usd daily stuck with rain or lack of stevedore labour and the like is a non starter.

Couple the above with the fact that the ompany's bankers reduced their facilities to zero. The directors had borrowed 500,000 usd last year and increased this by a further 788,000 usd . In the middle of March the Directors put a further million usd into the company but regrettably could not stem the tide of losses.

APPENDIX 1
(Exhibit A)

HAWKNET LIMITED
Company No. 02340237 (E&W)

DIRECTORS ESTIMATED STATEMENT OF AFFAIRS
AS AT 2nd MAY 2008

| | Notes | Net Book Value £ | £ | Estimated to Realise £ |
|---|---|---|---|---|
| ASSETS | | | | |
| Fixtures and Fittings | 1. | | 38,450 | Nil |
| Debtors | | | | |
| Trading | 2. | 375,064 | | 35 |
| Joint Venture | 3. | 11,931 | | 11,900 |
| Other | 4. | 15,160 | | 15,000 |
| | | | 402,155 | |
| Cash at Bank | | | 500 | 500 |
| Grosvenor Partners LLP - Client account | 5. | | 8,000 | 8,000 |
| Surplus / (Deficiency) to Preferentials | | | 449,105 | 35,435 |
| PREFERENTIAL LIABILITIES | | | | |
| Employee claims - Arrears | 6. | (14,214) | | |
| Employee claims - Holiday Pay | 6. | (16,548) | | |
| | | | (30,762) | (30,762) |
| Surplus to Chargeholder | | | 418,343 | 4,673 |
| DUE TO CHARGEHOLDER | 7. | | (0) | (0) |
| Surplus / (Deficiency) to Unsecured's | | | 418,343 | 4,673 |
| UNSECURED LIABILITIES | | | | |
| Trade Creditors | 8. | (24,082,742) | | |
| Crown | 9. | (11,437) | | |
| Directors Loan Account | 10. | (486,053) | | |
| Finance | | (563,844) | | |
| Other | | 0 | | |
| | | | (25,144,076) | (25,144,076) |
| Employee Claims | | | | |
| Arrears | 11. | (18,908) | | |
| Redundancy | 11. | (27,390) | | |
| Contractual Notice pay | 11. | (47,667) | | |
| Other - expenses etc | 11. | (2,464) | | |
| | | | (96,429) | (96,429) |
| Surplus / (Deficiency) to Members | | | (24,822,162) | (25,235,832) |
| SHAREHOLDERS INTEREST | | | (1,000) | (1,000) |
| Oveall Surplus / (Deficiency) | | | (£24,823,162) | (£25,236,832) |

NB: To be read in conjunction with the attached notes

HAWKNET LIMITED
Company No. 02340237 (E&W)

NOTES TO STATEMENT OF AFFAIRS AS AT 2nd MAY 2008

**The attached Statement of Affairs is compiled from information contained in the books and records of the company and from additional information made available by the Directors. Unless otherwise stated, the Statement does not make any provision for the cost of realisation or for the costs of the liquidation.**

1.   The NBV amount for Fixtures and Fittings is £38,450 from the accounts year ended 31 March 2007. Agents attended the company's premises and have verbally advised that there is no economic value, other than in the computer equipment which will need to be retained to protect the company's records.

2.   Trade debtors are mainly old or may be claimed as set-off against outstanding liabilities.

3.   The balance of the Joint Venture account is expected to be realised.

4.   This amount is expected to be the net sum due back from prepayments to the P&I club.

5.   The sum of £8,000 has been advanced to Grosvenor Partners LLP to cover the costs of the Statement of Affairs and convening the meetings.

6.   These are estimates of the preferential elements of the employee claims.

7.   The RBS facility of $750,000 was not renewed and at RBS's instigation was systematically reduced over the early months of 2008.

8.   Trade Creditors are listed in the attached schedules. For the purposes of this statement the USD claims have been converted at 1.9789 and Euro claims at 1.277.

9.   The amount due to HMRC is in respect of PAYE to 31 March 2008.

10.  The balance of the Directors Loans Accounts is the net due from sums injected into the company.

11.  The employee claims are estimates. The amount in respect of Contractual Notice is subject to mitigation.

APPENDIX 2
(Exhibit A1)

**HAWKNET LIMITED**
**Company No. 02340237 (E&W)**

**LIST OF UNSECURED CREDITORS AS AT 2nd MAY 2008**

LIST OF UNSECURED CREDITORS AS AT 2nd MAY 2008
(USD @ 1.9789  Euro@ 1.277)

| Creditor Name & Address | Notes | AMOUUNT £ : p |
|---|---|---|
| Advanced 3D Technologies Limited<br>Tuition House,27-37 St. Georges Road<br>London SW19 4EU | secured by rent deposit | 0.00 |
| AGN Shipleys Llp<br>10 Orange Street,Haymarket<br>London WC2H 7DQ | | 12,310.59 |
| Aldo Abela Surveys Ltd<br>98 Triq Patri Magri,,Marsa MRS 2201<br>MALTA | | 1973.38 |
| Ariel Finance / Baduir Rahman<br>arielmpl@singnet.com.sg, | | 43,353.20 |
| Ariston<br>Athene Financiera Corporation S.A.,99 Akti Miaouli G<br>185 38 Pireaus, GREECE | | 599,848.47 |
| Arkas Petrol Urunleri<br>Liman Caddesi Arkas Binasi,No. 38 Alsancak<br>35230 Izmir, TURKEY | | 17,529.97 |
| Astra<br>via Howe Robinson - brokers, | | 1,000.65 |
| B&K Agencies, Gdansk<br>Armii Krajowej,68/4 81-844 Sopot<br>POLAND | | 47,238.38 |
| Baltic Exchange<br>St Mary Axe,<br>London EC3A 8BH | | 2,580.78 |
| Baltic Trader<br>via E W vd Hude & Sons - brokers, | | 118.75 |
| Barwil Aden<br>C/O Barwil London,3a Newtons Court<br>Crossways, KENT  DA2 6QL | | 83.56 |
| Barwil Brazil<br>PO Box 91,Rua xv de Novembro<br>124 - 2nd floor,11.010-151 Santos - sp, Brazil | | 2,440.45 |
| Barwil Dubai<br>Barwil Ship Services Co UAE (LLC),Post Box 898<br>Fujairah, UAE | | 3,891.37 |
| Barwil Knudsen<br>Barwil Knudsen-Agente De Naegacao,Lda<br>A Dr Fernando Aroso,<br>1152 4th Floor 4450-664 Leca Da Palmeira<br>PORTUGAL | | 14,235.42 |
| Barwil Leixoes<br>Av Dr. Fernando Aroso,1152 P.O. Box 3144,<br>4450-664 Leca Da Palmeria,, PORTUGAL | | 20,667.74 |

APPENDIX 2
(Exhibit A1)

HAWKNET LIMITED
Company No. 02340237 (E&W)

LIST OF UNSECURED CREDITORS AS AT 2nd MAY 2008
(USD @ 1.9789  Euro@ 1.277)

| Creditor Name & Address | Notes | AMOUUNT £ : p |
|---|---|---|
| Barwil Muscat Towell Barwil Co Llc,Flat No. 2205 Way No 3516 Mbd Area, MUSCAT | | 2,321.08 |
| Barwil Redsea Bik C/O Barwil London,3a Newtons Court Crossways, KENT DA2 6QL | | 57.23 |
| Barwil Singapore Barwil Agencies Pte Ltd,,1 Kim Seng Promenade #16-09/12 Great World City West Tower SINGAPORE 2379949 | | 6,285.71 |
| Barwil Ukraine C/O Barwil London,3a Newtons Court Crossways, KENT DA2 6QL | | 1,149.49 |
| Barwil Weipa Australia Shipping Office Lorim Point,Weipa Queensland 4874, Australia | | 20,680.10 |
| Ben Line Agencies (China) Ltd 4/F Shanghai Bund No.12 Building 12 Zhong Shang Dong Yi Road Huang Pu District Shanghai 200 002, CHINA | | 7,552.12 |
| Benline Agencies (Indonesia) shg.ops@benline.com.cn, | | 11,905.55 |
| Berge Maritima Bilbao Espigon 3 - Muelle Vizcaya S/N Xona Portuaria - 48980, Santurce-Vizcaya, Spain | | 43,436.85 |
| Bernoport S.L. 36.000 Vilagarcia de Arousa, Vilagarcia, Spain | | 140.96 |
| BIMCO 161 Bagsaerdvej,2880 Bagsaerd DENMARK | | 978.86 |
| Blue Diamond IT 3rd Floor,,12/14 Devonshire Row LONDON EC2M 4RH | | 1,925.28 |
| Bolkar | | 2,859.99 |
| Boyd Campbell Co. P.O. Box 2976 Corpus Christi, TX 78403-2976, USA | | 3,271.47 |
| Braemar Seascope Pty Ltd Unit 4 Churchill Court, 335 Hay Street,,Subiaco Western Australia, 6008 AUSTRALIA | | 17,754.55 |
| Bridge Oil Limited 3rd Floor,36 Broadway, St. James LONDON  SW1 OBH | | 322,689.85 |

**HAWKNET LIMITED**
**Company No. 02340237 (E&W)**

**LIST OF UNSECURED CREDITORS AS AT 2nd MAY 2008**
(USD @ 1.9789  Euro@ 1.277)

| Creditor Name & Address | Notes | AMOUUNT £ : p |
|---|---|---|
| British Telecom<br>Alexander Bain House, 15 York Street<br>Glasgow, LANARKSHIRE, G2 8LA | | 195.76 |
| Bunkers International Corp<br>110 Timberlachen Circle, Suite 1012, Lake Mary<br>Florida 32746, USA | | 121,293.24 |
| China Hua Dong Corp Ltd<br>Room 905, South Zhongshan Rd.<br>SHANGHAI | | 13,739.96 |
| Clarkson Asia Ltd<br>Room 1706-10 Sun Hung Kai Centre<br>30 Harbour Road , Wanchai, HONG KONG | | 26,932.17 |
| CNS Shipping Gmbh<br>Deichstrasse 17, D-20459<br>Hamburg, Germany | | 485.51 |
| Comi Spain S.L.<br>Gran IA 17-5, 48001 Bilbao SPAIN | | 293.66 |
| Communications Solutions Providers Ltd<br>PO Box 8822, High Street<br>Dunmow, ESSEX CM6 1YU | | 1,266.62 |
| Compass Marine<br>C/Irlanda 22, 38300 La Orotava, Santa Cruz De Tener<br>Canary Islands, SPAIN. | | 626.47 |
| DHL Intnl. Uk Ltd<br>PO Box 192 Feltham, MIDDLESEX<br>TW14 0YB | | 52.57 |
| Dial Ltd<br>732 Chigwell Road, Woodford Bridge<br>ESSEX IG8 8AL | | 393.78 |
| E.W.vd. Hude & Son<br>Havnepladsen 2,<br>5700 Svendborg, DENMARK | | 19,817.75 |
| Eculine Canada<br>10340 Cote De Liesse, Suite 203,<br>Montreal, QC H8T 1A3, CANADA | | 1,945.53 |
| Equinox Voyager | | 9,031.20 |
| Eurochart Sa<br>Aethrion Centre, 40 Ag. Konstantinou Ave.<br>Maroussi 15124, Greece | | 25,340.72 |
| Finntrepo Limited<br>Lonnrotinkatu 3, FI-00120<br>Helsinki, Finland | | 175,370.34 |
| Galbraith's Ltd<br>Bridgegate House, 124-126 Borough High Street<br>London SE1 1BL | | 22,875.87 |

HAWKNET LIMITED
Company No. 02340237 (E&W)

LIST OF UNSECURED CREDITORS AS AT 2nd MAY 2008
(USD @ 1.9789  Euro@ 1.277)

| Creditor Name & Address | Notes | AMOUUNT £ : p |
|---|---|---|
| George Lyras via Howe Robinson - brokers, | | 974.59 |
| Goltens P.O. Box 2501, Fujairah, UAE | | 8,632.07 |
| Griffin Marine Travel Ltd 21 Angel Gate,,City Road, London EC1V 2PT | | 666.45 |
| Gulf & Continental Bunker Fuels P.O. Box 18068, Jebel Ali Dubai, UAE | | 133,815.26 |
| Gulf Agency Co (Egypt) 10 Gohar El Kaied Street, PO Box 78, Suez, Egypt. | | 564.07 |
| Hacklin Mantyluoto,Fin-28880 Pori, FINLAND | | 242.14 |
| Harbour Insurance Brokers  Ltd Winterton House,Market Square Westerham, KENT TN16 1AQ | | 10,697.99 |
| HML Shipping Limited Haegerstrand, Madsen, Lingren,Box 98 SE-820 20 Ljusne, SWEDEN | | 468.49 |
| Howe Robinson 77 Mansell Street, London   E1 8AF | | 128,582.06 |
| Hugo Trumpy Via S.Siro,10 16124 Genova (GE) Italy | | 106.5 |
| Ice Princess Elena Shipping Agency Co Ltd,,810-11 Aleutskaya St Vladiostok,, 690090 RUSSIA | | 14,249.84 |
| Inchcape Shipping Australia Unit 4 Churchill Court,335 Hay Street Subiaco Western Australia, 6008 Australia | | 93.02 |
| Inchcape Shipping Mombasa Inchcape Shipping Services Kenya Ltd,Inchcape House,Archbishop Makarios Cis,Off Moi Avenue P.O. Box 90194, Mombasa, Kenya | | 669.91 |
| Inchcape Shipping Services (Uk) Ltd Unit 6 - 7 Lakeside Business Village,Fleming Road Chafford Hundred, ESSEX RM16 6YA | | 32,046.39 |
| Inchcape Shipping Services Egypt El Mosheir Ahmed Ismail Street,Heliopolis Cairo, Egypt | | 11,468.49 |

**HAWKNET LIMITED**
**Company No. 02340237 (E&W)**

**LIST OF UNSECURED CREDITORS AS AT 2nd MAY 2008**
(USD @ 1.9789  Euro@ 1.277)

| Creditor Name & Address | Notes | AMOUUNT £ : p |
|---|---|---|
| Independent Surveyors Co.<br>No. 6 2nd Floor, Bldg 102, 2nd Andisheh Alley,North Sohreardi Str<br>15696 Tehran, IRAN | | 424.48 |
| Int Viking Transports Sl<br>Muralla Del Mar 8 - 1A,<br>30202 Cartegena, SPAIN | | 2,994.52 |
| intertek Pakistan (Pvt) Ltd<br>163/D Miran Mohammad Shah Road<br>KDA Scheme No 1<br>Karachi, PAKISTAN | | 379.00 |
| Island Skipper<br>Granicos Ene<br>C/O Paralos Maritime Corporation Sa<br>23 Akti Miaouli 185 35, PIRAEUS GREECE. | | 39,920.30 |
| Iso Peritagens Cargas E Seguros<br>Lda Main Management & Ops Central Office<br>A 24 De Julho 130- 3 Dr-1350-346<br>Lisboa, PORTUGAL | | 2,325.36 |
| IVS Kenso<br>via SSY Brokers, | | 8,335.42 |
| J Martens AS<br>Kristiansund Port,<br>NORWAY | | 4,778.86 |
| Jackson Parton Solicitors<br>4th Floor,1 Alie Street<br>London   E1 8DE | | 53,748.60 |
| Jinshen Marine & Cargo Services<br>Room  505 Gate 14,Saiyuan Li, Zhongshan<br>N.Road He Bei Dist.,Tianjin, CHINA | | 252.67 |
| Jonssonnovabolagen Norrkoping<br>Jungmansgatan 3,<br>60102,  Norkoping, SWEDEN | | 2,233.72 |
| Kadmos<br>Via Howe Robinson Brokers, | | 53,480.30 |
| Lind Stoneship AS<br>Thorsoveien 1,,N-1634 Gamle Fredrikstad<br>NORWAY | | 99,212.04 |
| Lind-Stoneship As<br>Thorsoveien 1,<br>N-1634 Gamle Fredrikstad, NORWAY | | 1,900.00 |
| London Shipbroking Co Ltd<br>288 Bishopgate,<br>London   EC2M 4QP | | 18,307.41 |

HAWKNET LIMITED
Company No. 02340237 (E&W)

LIST OF UNSECURED CREDITORS AS AT 2nd MAY 2008
(USD @ 1.9789  Euro@ 1.277)

| Creditor Name & Address | Notes | AMOUUNT £ : p |
|---|---|---|
| London Steam Ship Owners Mutual Ins<br>50 Leman Street,<br>London  E1 8HQ | | 857.29 |
| Marincom Intl Systems Ltd<br>P.O. Box 63102,,<br>Montreal, H2E 1VE CANADA | | 4,314.52 |
| Maritima Candina S.L.<br>San Vincente, No.8,,Edificio Albia Ii - Pl Baja,<br>48001 Bilbao, Spain | | 18,932.45 |
| Med-Sea Shipping<br>G. Debona Square,Msida<br>MSD10 MALTA | | 16,624.44 |
| Medway Ports<br>The Mersey Docks & Harbour Co.,,Maritime Centre<br>Port of Liverpool    L21 1LA | | 3,194.90 |
| Meerpahl & Meyer Gmbh<br>Schiffsmakler,,Katharinenstr, 7-9,<br>20457 Hamburg, | | 1,448.71 |
| Miltiadis Junior<br>via Howe Robinson - brokers, | | 3,526.48 |
| Monjasa A/S<br>Strevelinsvej 4.,<br>7000 Fredericia, DENMARK | | 38,438.30 |
| Nats Emperor<br>Via Howe Robinson Brokers, | | 1,120,862.73 |
| Navmar Shipping<br>1-Victor Bassily Street,<br>Alexandria, EGYPT | | 417.27 |
| New Marine Oil<br>1 Triangle Business Park,<br>Stoke Mandeville, Bucks  HP22 5BL | | 159.73 |
| Nord<br>via broker - E W vd Hude & Sons,<br>Denmark | | 7,839.92 |
| Nortrop Ltd<br>Ap 55,15 Tenistaya Str.,<br>Odessa, UKRAINE | | 1,739.00 |
| Nw Trading Logistics Ltd<br>Cavendish Wharf,Off Duke Street<br>Birkenhead    CH14 1HN | | 44,968.60 |
| O.W.Bunker Far East (S) Pte Ltd.<br>600 North Bridge Road,#14-02/03 Parkiew Square<br>SINGAPORE  188778 | | 93,722.56 |
| O2<br>O2 Customer Services,Po Box 202<br>Houghton Regis,  LU6 9AG | | 15.00 |

HAWKNET LIMITED
Company No. 02340237 (E&W)

LIST OF UNSECURED CREDITORS AS AT 2nd MAY 2008
(USD @ 1.9789  Euro@ 1.277)

| Creditor Name & Address | Notes | AMOUUNT £ : p |
|---|---|---|
| Oy M Rauanheimo Ab<br>Box 254 Fin-67101,<br>Kokkola, FINLAND | | 127.5 |
| Pandiservice S.A.<br>Centro Ciudad Comercial Tornanaco (C.C.C.T)<br>Torred,Piso1, Offic D-106 Chuao<br>Caracas, VENEZUELA. | | 715.55 |
| Pen Wallam<br>Wallem Group Ltd<br>2/F Warwick House East<br>Taikoo Place 979 Kings Road<br>Quarry Bay Hong Kong, | | 602.64 |
| Penavico Huangpu<br>330 Zhongshan Road (N),<br>Nanjing, CHINA  210003 | | 1,322.34 |
| Perez Torres Maritima SL<br>Pab De Ser.Explotac,1A Pl. Muelle De San Diego<br>Puerto De La Caruna, SPAIN | | 59,282.00 |
| Pettinger Hilton (Shipping) Ltd<br>E.S.A.B. House,West End<br>Herstmonceux, EAST SUSSEX<br>BN27 4NH | | 2,068.81 |
| Professor Barabanov<br>Royalship Maritime Inc., | | 56,922.25 |
| Rabet Co. Ltd<br>EMAIL SALEH@RABETSHIP.COM, | | 6,046.31 |
| Rentrans Cargo Sp<br>Zoo Ul Moniuszki 20,<br>71-430 Szczecin, POLAND | | 137.42 |
| Scott Robson Accountancy Services<br>scottmichaelrobson30@hotmail.com, | | 2,400.00 |
| Sea Unity<br>via Howe Robinson - brokers, | | 3,284.65 |
| Shipping Corporation Jeddah<br>Arab Maritime Centre,Malik Khalid Street<br>21441 - Jeddah, SAUDI ARABIA | | 8,784.56 |
| Shou Chang Hai<br>via Clarksons Asia Ltd - brokers, | | 3,158.95 |
| Simpson Spence & Young<br>Level 21, 1 York Street,Sydney<br>NSW 2000, AUSTRALIA | | 32,369.42 |
| Star Evanger | | 8,994.90 |
| Strand Shipping<br>P.O. Box 244,<br>8601 Mo I Rana, NORWAY | | 930.20 |

HAWKNET LIMITED
Company No. 02340237 (E&W)

LIST OF UNSECURED CREDITORS AS AT 2nd MAY 2008
(USD @ 1.9789  Euro@ 1.277)

| Creditor Name & Address | Notes | AMOUUNT £ : p |
|---|---|---|
| Streetwise Couriers 8 Shannon Commercial Centre,Beverley Way New Malden, SURREY KT3 4PT | | 21.60 |
| Sulnave Ul.Krajowej 68/4,81-844 Sopot POLAND | | 513.79 |
| Summer Tariff Service 1012 14Th Street,,N.W. Suite 905, Washington DC 20005, USA | | 102.08 |
| Sunwoo Merchant Marine Co. Ltd, 12F Kyobo Book Building,73 Naesu, Dong Cho Ngno Seoul 110071, SOUTH KOREA | WORADA NAREE | 355,963.74 |
| Swift | | 9,247.06 |
| Taylor & Co (Marine) Ltd Elorza & Cia, S.A.,Gran Ica 17-5 Departamentos 11-1 48001 - Bilbao, SPAIN | | 1,544.30 |
| Thor Shipping AS 31 Brogade,DK5700 Svendborg, Denmark | | 119,256.25 |
| Tolmi MacTaggart Shipping & Navigation Ltd, | | 1,187,318.71 |
| Traficos Y Servicios C/Gran Via, 17-5Th Floor,48001 Bilbao, Vizcaya, Spain | | 3,206.93 |
| Turner & Co (Gibraltar) Ltd P.O.Box 109,Irish Town, GIBRALTAR | | 348.89 |
| Ulverton Trade Finance | | 520,491.18 |
| United Canals Agency Gmbh Maklerstrabe 11-14,D-24159 Kiel, GERMANY | | 17,243.11 |
| Uwe Baltz uwe_baltz@hotmail.com, | | 6,837.44 |
| V.Ships Hansen 12F-1 No 29, Hsibian Road,, Kaohsiung, TAIWAN, ROC | | 4,666.58 |
| Wimbledon Offices Ltd 27-37 St Georges Road,Wimbledon London  SW19 4EU | | 3,215.94 |
| Yakin Dogu Cancaris & Fils Shipping Ltd,,Rihtim Cad, No.55, Eli Alemdar, Han Kat 6 No. 614, 80030, Karakoy, Istanbul, TURKEY | | 3,110.18 |

**HAWKNET LIMITED**
**Company No. 02340237 (E&W)**

LIST OF UNSECURED CREDITORS AS AT 2nd MAY 2008
(USD @ 1.9789  Euro@ 1.277)

| Creditor Name & Address | Notes | AMOUUNT £ : p |
|---|---|---|
| Yantai Port Ocean Shipping Ag<br>3Rd Floor, No 23 Haigang Road,Yantai<br>Shandong, CHINA | | 8,646.72 |
| Yuan Ning Sea<br>via Howe Robinson - brokers, | | 1,134.21 |
| Zinifex Century Ltd<br>Freshwater Place, Level 29,2 Southbank Boulevard<br>Southbank<br>Victoria 3006, Australia | Arbitration claim | 18,007,768.96 |
| HM Revenue & Customs<br>Scotland South Area, Elgin House<br>20 Haymarket Yards<br>Edinburgh  EH12 5WN | CT Ref 809<br>27720 10128 | 0 |
| HM Revenue & Customs<br>North East Metropolitan Area<br>Fountain Court,19 Grange Road<br>Middlesborough TS1 2AU | PAYE 120/H2145 | 11,437.00 |
| HM Revenue & Customs<br>Insolvency,Queens Dock<br>Liverpool   L74 4AF | VRN 562 2145 64 | 0 |
| Guy & Janet Walker<br>10 Cambridge Avenue,<br>New Malden, SURREY  KT3 4JZ | | 486,053.02 |
| MAC Navigation Limited<br>c/o Dominion International Services Inc,1 Palea<br>Poseidenonos Ave<br>17561 Palea Faliro, Greece | Holman, Fenwick<br>and Willan | 555,864.37 |
| E. G. Arghyrakis & Co.<br>(Representing Conagra International Fertilizer Co.)<br>11 Bouverie Street,<br>London  EC4Y 8DP | | 34,362.52 |
| TOTAL | | £25,144,076.88 |

## HAWKNET LIMITED

### STATUTORY INFORMATION

| | |
|---|---|
| **Company Number:** | 02340237 |
| **Date of Incorporation:** | 27-Jan-89 |
| **Authorised Share Capital:** | 1000 Ordinary Shares of £1 each |

| **Directors:** | Guy Peter Wolf Walker | Appted pre 27/01/1992 |
|---|---|---|
| | Janet Chartres Walker | Appted pre 27/01/1992 |

| **Secretary :** | Janet Chartres Walker | Appted pre 27/01/1992 |
|---|---|---|

| **Shareholders:** | Guy Peter Wolf Walker | 500 Ordinary Shares |
|---|---|---|
| | Janet Chartres Walker | 500 Ordinary Shares |

**Trading Address:**  Tuition House, 27-37 St Georges Road, Wimbledon SW19 4DS

**Registered Office:**  6-7 Ludgate Square, London EC4M 7AS (formerly at: Tuition House, 27-37 St Georges Road, Wimbledon SW19 4DS)

**Bankers:**  Royal Bank of Scotland, Shipping Business Centre, London

**Charges:**  Debenture granted to Royal Bank of Scotland plc - created 29 June 2006 and registered on 1st July 2006 and being recorded as a Fixed and Floating Charge over the company's assets and undertaking.

**Auditors:**  Shipleys LLP, 10 Orange Street, Haymarket, London WC2H 7DQ

HAWKNET LIMITED
Company Number: 02340237 (E&W)

FINANCIAL INFORMATION

|  | Year Ended 31/03/2006 £ | Year Ended 31/03/2007 £ |
|---|---|---|
| TRADING AND PROFIT AND LOSS ACCOUNTS | | |
| Turnover | 21,233,768 | 38,513,614 |
| Gross Profit | 1,086,864 | 1,194,747 |
| Administration costs | (689,341) | (1,100,844) |
| Net Profit/(Loss) pre-tax | 233,023 | 45,949 |
| Net Loss post-tax | 172,311 | 24,005 |

| BALANCE SHEET | | |
|---|---|---|
| Fixed Assets | | |
| Current Assets | | |
| Debtors | 2,022,692 | 6,422,121 |
| Cash | 342,591 | 673,675 |
| Current Liabilities (falling due within 1 year) | | |
| Creditors | (2,252,267) | (6,958,378) |
| Bank Overdrafts/Loans | | |
| Liabilities (falling due after more than 1 year) | | * |
| Net Assets/(Liabilities) | 113,016 | 137,418 |
| Represented by: | | |
| Share Capital | 1,000 | 1,000 |
| Reserves | 150,863 | 174,868 |

Other:
* Commitmentsunder operating leases

|  |  |  |
|---|---|---|
| Within 2-5 years | | 194,431 |

**HAWKNET LIMITED**
Company No. 02340237 (E&W)

DEFICIENCY ACCOUNT
AS AT 2nd MAY 2008

|  | £ |
|---|---:|
| Balance on Reserves per accounts at 31 March 2007 | 174,868 |
| Less: Assets written down/off: | |
| Fixtures & Fittings | (38,450) |
| Claims arising on cessation: | |
| Employee claims | (124,727) |
| Exceptional Items: | |
| Zinifex - Arbitration claim | (18,007,769) |
|  | (17,996,078) |
| Difference arising since last accounts | 7,240,754 |
| Overall Deficiency per Statement of Affairs | (£25,236,832) |