```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
NATS EMPEROR SHIPPING LIMITED,
                                                08 Civ. 3763 (BSJ)

            Plaintiff,


      -against-


HAWKNET LIMITED and BROBULK LIMITED,


            Defendants.
----------------------------------------X
```

MEMORANDUM OF LAW
IN OPPOSITION TO MOTION

```
Edward A. Keane (EK 1398)
Garth S. Wolfson (GW 7700)

    Of Counsel
```

MAHONEY & KEANE, LLP
Attorneys for Plaintiff
NATS EMPEROR SHIPPING LIMITED
11 Hanover Square, Tenth Floor
New York, New York 10005
(212) 385-1422

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES..............................................ii

ARGUMENT...........................................................1

    POINT I.    PLAINTIFF'S COMPLAINT SUFFICIENTLY PLEADS
                  A <u>PRIMA FACIE</u> CLAIM UNDER <u>AQUA STOLI</u>........1

    CONCLUSION.................................................10

<u>ARGUMENT</u>

POINT I.  PLAINTIFF'S COMPLAINT SUFFICIENTLY PLEADS A <u>PRIMA FACIE</u> CLAIM UNDER <u>AQUA STOLI</u>.

While, as defendant BROBULK LIMITED (BROBULK) has asserted, some courts have employed a "reasonable grounds" test, <u>Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty, Ltd.</u>, 460 F.3d 434 (2d Cir. 2006), held that the Court should look only to whether the <u>prima facie</u> requirements of Rule B have been met, <u>i.e.</u> that plaintiff alleges a maritime claim against the defendant, the defendant can not be found in the district, the defendant's property is in the district, and there is no other statutory or maritime law bar to the attachment. <u>Id.</u>

Since then, "'of the courts in this district to have considered the issue, the majority have interpreted *Aqua Stoli* to require the application of the *prima facie* standard when considering the adequacy of the claim asserted in the context of a maritime attachment.'" <u>Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transp. N.V.</u>, No. 07 Civ. 3076 (LAP), 2007 U.S. Dist. LEXIS 50260, *9 (S.D.N.Y. Jul. 6, 2007) (quoting <u>OGI Oceangate Transp. Co. v. RP Logistics Pvt. Ltd.</u>, No. 06-9441 (RWS), 2007 U.S. Dist. LEXIS 46841 (S.D.N.Y. Jun. 26, 2007) (citing cases)); <u>see also</u>, <u>Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.</u>, 07 Civ. 5798 (CM), 2007 U.S. Dist. LEXIS 74477, *22 (S.D.N.Y. Oct. 1, 2007) ("As a threshold matter, I reject defendants' presumption that the applicable standard to be applied to plaintiff's pleadings is the 'fair probability'

standard. The majority of courts in this district have understood *Aqua Stoli* to require the application of the *prima facie* standard when considering the adequacy of a claim in a maritime vacatur Motion.") (compiling cases); <u>SPL Shipping Ltd. v. Gujurat Cheminex Ltd.</u>, No. 06 Civ. 15375 (KMK), 2007 U.S. Dist. LEXIS 18562, *10 (S.D.N.Y. Mar. 15, 2007) ("Therefore, this Court will only look to Plaintiff's pleadings, and not to any evidence submitted by the Parties, to determine whether Plaintiff has made a legally sufficient claim.").

But, under any standard, "maritime plaintiffs are not required to prove their cases at this stage of a Rule E(4) hearing." <u>Id.</u> at *12 (citing <u>SPL Shipping Ltd. v. Gujurat Cheminex Ltd.</u>, No. 06-15375, 2007 U.S. Dist. LEXIS 18562, 2007 WL 831810, *2 (S.D.N.Y. Mar. 15, 2007)).

In particular, specific allegations that the alleged alter-ego and the contracting party paid one another's debts have near-routinely been held to support Rule B attachments. As discussed in <u>SPL Shipping</u>:

> Plaintiff has essentially made three allegations against Nirma: first, that Nirma has in this case, and in other cases, made payments on behalf of Gujarat to third parties; second, that "there existed such unity of ownership and interest . . . that no separation exists between" Nirma and Gujarat, such that the "corporate form has been disregarded;" and third, that Nirma has "dominated and used" Gujarat "for their [sic.] own purposes such that there is no meaningful difference between the three entities and there has been an intermingling of funds between the several entities." Both factors are found among the list of factors a

> court may consider when alter ego status has been pled and are sufficient to state a valid admiralty claim.

SPL Shipping, 2007 U.S. Dist. LEXIS 18562 at *11 (citations omitted) (compiling cases).

Similarly, the court in World Reach Shipping Ltd. v. Industrial Carriers Inc., No. 06 Civ. 3756 (NRB), 2006 U.S. Dist. LEXIS 83224 (S.D.N.Y. Nov. 9, 2006), found:

> World Reach alleges that BlueCoast "is the alter ego of ICI because ICI dominates and disregards BlueCoast's corporate form to the extent that BlueCoast is actually carrying on ICI's business and operations as if the same were its own or vice versa." World Reach further alleges that BlueCoast "acts as paying agent, or arranges for other non-parties to satisfy the debts and obligations of ICI." That BlueCoast "has made hire payments to World Reach to satisfy ICI's debts and obligations," and that BlueCoast "was intimately involved in the specific details of the Charter Agreement." These pleadings give reasonable grounds for piercing the corporate veil and plainly state a prima facie case that BlueCoast is an alter ego of ICI.

World Reach, 2006 U.S. Dist. LEXIS 83224 at *11.

Operating under the so-called "reasonable grounds" standard, the court in Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd., 475 F. Supp. 2d 275, 280-281 (S.D.N.Y. 2006), also held:

> The allegation that ATL-BVI and ATL-Shanghai encouraged third parties to pay debts owed by them directly to Via Sistina is highly relevant to a veil-piercing theory, because it implicates a number of these factors, including disregard of corporate formalities, intermingling of funds, transactions not at arm's length, and failure to treat the corporations as independent profit centers . . . In short, the evidence that Via Sistina

3

> has routinely disregarded the corporate form of both ATL-BVI and ATL-Shanghai is sufficient to establish a valid prima facie claim for veil-piercing, and thus constitutes reasonable grounds to sustain the attachment.

Wajilam, 475 F. Supp. 2d at 284-85.

And the cases go on and on. See, e.g., Hawknet Ltd. V. Overseas Shipping Agencies, No. 07 Civ. 5912 (NRB), 2008 U.S. Dist. LEXIS 35542, **14-16 (S.D.N.Y. Apr. 29, 2008) ("[P]laintiff alleges that the wire transfer was made on behalf of TOM 'c/o MOS Overseas shipping . . . which shows a lack of corporate separateness' . . . In sum, the allegations of the Proposed Second Amended Complaint are not 'wholly conclusory.'") (quoting Brave Bulk Transp. Ltd. v. Spot On Shipping Ltd., No. 07 Civ. 4546 (CM), 2007 U.S. Dist. LEXIS 81137, 2007 WL 3255823, *6 (S.D.N.Y. Oct. 30, 2007)) Tide Line, Inc. v. Eastrade Commodities, Inc., No. 06 Civ. 1979 (KMW), 2006 U.S. Dist. LEXIS 95870, 2007 A.M.C. 252 (S.D.N.Y. Aug. 15, 2006) (holding proposed amended pleadings, including allegations that the alleged alter-ego made payments on behalf of the contracting party, sufficient under Rule B); Ullises Shipping Corp. v. FAL Shipping Co., 415 F. Supp. 2d 318, 2006 A.M.C. 1094 (S.D.N.Y. 2006) ("[Under reasonable grounds standard], Ullises presents enough evidence to satisfy its burden with respect to FAL Oil. FAL Oil paid FAL Shipping's debts under the agreement with Ullises from FAL Oil

4

accounts."). Simply stated, evidence of an intent to defraud creditors through the use of another corporate entity to divert funds will readily support such a pleading.

The complaint at bar contains allegations virtually indistinguishable from those which have been repeatedly sustained by this Court. (Complaint, Exhibit A to Prieto Declaration, at ¶¶ 6-16).

Moreover, the attachment order at issue is not the first to issue against defendant HAWKNET LIMITED (HAWKNET). <u>See, e.g.</u>, <u>Mac Navigation Ltd v. Hawknet Ltd,</u>, No. 08 Civ. 3512 (RMB); <u>Bridge Oil Ltd. v. Hawknet Limited</u>, No. 08 Civ. 3615 (DAB); <u>Stelios Maritime Co. v. Hawknet L.T.D.</u>, No. 08 Civ. 3743 (DAB); <u>Kadmos Maritime v. Hawknet L.T.D.</u>, No. 08 Civ. 3747 (GBD); <u>CMC Europe AG v. Hawknet Ltd.</u>, No. 08 Civ. 3882 (LAK). And the Complaint provides a detailed accounting of BROBULK's role as HAWKNET's proxy, making and receiving payments on HAWKNET's behalf, and facilitating and abetting HAWKNET's efforts to avoid its debts and the attachment orders of this Court. (Complaint, Exhibit A to Prieto Declaration, at ¶¶ 12-14).

The veneer painted by BROBULK's counsel to portray BROBULK's involvement as merely the product of "arms-length" transactions between two disinterested, unrelated parties does not withstand scrutiny. That obscure explanation

remains inscrutable and impossible to justify by any reasonable profit motive. Certainly, it can not be accepted at face value, without even having the benefit of *any* discovery at all on the matter.

And BROBULK's attempt to explain away the simple fact that it is running interference for HAWKNET, effectively supplanting HAWKNET in every respect with regard to claiming monies owed to HAWKNET, yet asserting separateness whenever it comes to HAWKNET's liabilities, can not be overlooked. HAWKNET's Charter Party itself directs payment "in favour of Brobulk LTD." (Charter Party Cover Page, Exhibit 2 to Keane Declaration). And on at least three occasions known to plaintiff, hire payments due to HAWKNET were paid to BROBULK. (Transaction Detail Reports, Exhibit 3 to Keane Declaration). Whether BROBULK's position is pretextual or not, at the very least the prima facie justification for plaintiff's complaint is readily established by these factual allegations.

That Plaintiff has a valid lien for sub-freights, the very funds which gives rise to the instant suit, is uncontested by HAWKNET. (Exhibits E-F to Prieto Declaration; see also, Time Charter, Exhibit 1 to Keane Declaration). It is admitted those funds were diverted from being used to pay for the charter of the plaintiff's vessel by the device of having BROBULK receive those

sub-freights for its account. (Paulsson Declaration, at ¶ 8). Likewise, it is undisputed that the arrangement which BROBULK uses to justify that development was orchestrated, not by BROBULK acting through its Board of Directors (or its claimed parent GAC, which is referred in its Order to Show Cause but otherwise apparently uninvolved and thus irrelevant to this matter), but by one Simon Rye, a "mutual acquaintance" of Brobulk's Paulsson and HAWKNET's director Guy Walker. (Hicks Declaration, Exhibit 4 to Keane Declaration, at ¶ 6). Also uncontested is that the device or devices used to strip HAWKNET of its cash flow in the form of sub-freights due it from sub-charters were purportedly concocted while it was fully known HAWKNET was in financial distress. (Paulsson Declaration, at ¶ 9). While Paulsson claims to not have known HAWKNET was already insolvent at the time of the "loan," or that liquidation of HAWKNET would follow immediately after it, that assertion flies in the face of one of the admitted reasons for the claimed arms length "loan," specifically, offering funds to allow HAWKNET to pay for bunkers. (Paulsson Declaration, at ¶ 8). Any ship operator recognizes the inability to pay for the fuel for the vessel is the equivalent of a car owner no longer being able to pay for gas for its car, much less keep up with its financing on the car. It stretches credulity to accept that such a "loan" would be made without the lender, in the exercise of even a modicum of due diligence, becoming aware of HAWKNET's purported difficulties.

Indeed, BROBULK's explanation is belied by the Director's Report submitted at the Meeting of Creditors plaintiff's solicitors have now obtained. The reality is that any due diligence would have revealed the disastrous state of HAWKNET's financial situation. The full extent of HAWKNET's finances has yet to be disclosed, but the accompanying affidavit of Mr. Hicks, acting for plaintiff, demonstrates beyond cavil the nefarious nature of the transaction. <u>See, generally</u>, Hicks Declaration, Exhibit 4 to Keane Declaration. Instead of a true arms length business loan to a solvent lendee, we see the outline, from Paulsson's own words, of a not-so-clever effort to simply divert funds from an empty shell to Brobulk and Walker who took from those funds unspecified "commissions" and the full repayment of a purported "loan," all the detriment of the plaintiff in this action.

Exactly how blind an eye to the financial distress of HAWKNET BROBULK turned at the time it devised its arrangement with HAWKNET remains unknown, as HAWKNET, through its solicitors has refused to divulge any of the terms of the so called "arms length transaction" between HAWKNET and BROBULK/Walker, although asked to do so by plaintiff's solicitors. (Exhibits G-H to Prieto Declaration) ("[W]e are not in a position to provide any further details or a copy of the loan agreement."). HAWKNET's solicitors offer a variety of unconvincing rationales for that stone-walling of any information about the bona fides of the "loan," but never

8

the most cogent reason: that there is no writing to produce which sets forth the terms and conditions which are claimed to allow the moving of funds from an insolvent to third parties. (Paulsson Declaration, at ¶ 10). The failure to divulge whatever underlying documentation may exist we now know continues even through the liquidation process in London. (Hicks Declaration, Exhibit 4 to Keane Declaration).

While BROBULK makes much of its good standing in the shipping community, one must, with due respect, question how many well-run, above-board shipping companies make last minute undocumented "loans" to charterers unable to pay for bunkers upon the request of "acquaintances" not involved in the lendee corporation. We suggest the answer to that question is zero, which only underscores why the instant complaint and attachments of plaintiff are sound.

At a minimum, discovery into the devices now claimed to allow BROBULK to subvert plaintiff's legitimate lien against sub-freights earned by HAWKNET through the use of plaintiff's vessel should be allowed. (Hicks Declaration, Exhibit 4 to Keane Declaration). Without that, BROBULK has otherwise obtained a simple way to allow shell companies to use vessels on hire, avoid paying for same, and have another company fraudulently receive full payments due the shell company. That surely cannot be the proper result in this matter.

CONCLUSION.

WHEREFORE, plaintiff urges the Court to deny BROBULK's motion, by order to show cause, to vacate the order of attachment, and to grant to plaintiff such other and further relief as this Honorable Court may deem just and proper.

Dated:   New York, New York
         May 12, 2008

                                    Respectfully submitted,

                                    MAHONEY & KEANE, LLP
                                    Attorneys for Plaintiff
                                    NATS EMPEROR SHIPPING LIMITED

By:   _____
      Edward A. Keane (EK 1398)
      111 Broadway, 10th Floor
      New York, NY 10006
      (212) 385-1422