UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

NATS EMPEROR SHIPPING LIMITED

                                         Plaintiff,    :        08 Civ. 3763 (BSJ)

                                      :

- against -                              :

HAWKNET LIMITED and BROBULK LIMITED  :

                                      :

                         Defendants.   :

--------------------------------------------------------------------X

DECLARATION OF JOHN HICKS IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO THE MOTION TO VACATE THE
ATTACHMENT AGAINST THE DEFENDANTS' PROPERTY

I, John Hicks, declare under penalty of perjury of the laws of the United States of America as follows:-

1.   I have seen the Declarations of Mr. Houghton dated 13th May and of Mr. Paulsson bearing the same date.

2.   On 28th April I asked Winter Scott on behalf of the Defendant Brobulk to let us have a copy of the alleged loan agreement between Brobulk and Hawknet and, amongst other things, explain why any amount was paid to Mr. Walker of Hawknet. Their response on 29th April was that a Liquidator had been appointed and they would instead cooperate with the Liquidator. The point made in my earlier Declaration is that as at the date of the Creditors' Meeting on 6th May the Liquidator had received no documents whatsoever from anybody in connection with the alleged loan agreement or paid to by Brobulk and apparently distributed to Mr. Walker, amongst others. While Brobulk's English solicitors may prefer that we debate with the Liquidator of Hawknet as to who is entitled to subfreights collected by Brobulk, since my clients served a valid Notice of Lien over these subfreights it remains my view that it is Brobulk who must justify their position rather than that my clients should debate this with the Liquidator of a third party.

3.   That Brobulk introduced themselves to the Liquidator only on 8th May is surprising since they were aware by as early as 25th April that there would be a Creditors' Meeting before the Liquidator on 6th May (see Winter Scott fax of 25th April) and this was the first notice we received of the appointment of the Liquidator or that a meeting had been fixed – clearly Brobulk were being kept closely advised of this, whereas my clients were not. Since Mr. Walker of Hawknet advised at the meeting there were no documents in connection with these alleged loans, a position which I note is not endorsed by either Mr. Houghton or Mr. Paulsson, it is unhelpful for Mr. Houghton to suggest that he "expected that the correspondence relating to the loans was on Hawknet's files, but if not or if the Liquidator wanted any further information they should contact [him] accordingly."

4. In paragraph 5 of his Declaration Mr. Houghton suggests that he does not know what the sum of US$67,977.78 received by Brobulk represented. In fact I wrote to Mr. Houghton yesterday and attached for his reference a copy of the remittance advice of the Subcharterers ConAgra advising Brobulk that this was a remittance of freight. Brobulk obviously were aware of this at the date of remittance on 10th April and it is disingenuous of them to suggest otherwise. A copy of my message to Winter Scott and the Liquidator together with the remittance advice is attached as Exhibit 1 to this Declaration.

5. In any event this Court will note that neither Brobulk nor its solicitors are yet willing to disclose any documents to show that the arrangements between themselves and Hawknet were an innocent arm's length transaction and their continuing omission to do so in my submission speaks for itself.

6. Paragraph 3 of Mr. Paulsson's Declaration suggests that because Brobulk paid US$542,100 to my clients that this seems to have legitimized the collection by Brobulk of freights amounting to US$1,558,233.76 plus US$67,977.78 = US$1,626,211.54 of which only one-third was paid to the Owners of "NATS EMPEROR". In his First Declaration Mr. Paulsson stated that Brobulk agreed to pay certain instalments of hire due from Hawknet to shipowners under separate transactions – paragraph 8(a). However from the explanation of what he did with the funds collected which appears in paragraph 7 of his Second Declaration it is clear that although he knew that "Hawknet was undergoing temporary cash flow problems … [but] … was not aware that Hawknet was or would become insolvent …" (paragraph 9, First Declaration) he nonetheless unhesitatingly used US$556,236.97 of "NATS EMPEROR" subfreight to pay hire to the Owners of "TOLMI" on 27th March even though he had already paid US$1,579,223.65 to Hawknet in respect of "TOLMI" subfreights only nine days earlier on 19th March. From the descriptions provided by Mr. Paulsson of these transactions he clearly knew what he was doing and must also have known that by using subfreights collected from the "NATS EMPEROR" to pay hire due to the Owners of "TOLMI" even though Hawknet had received in excess of US$1,500,000 to pay "TOLMI" hires only 9 days earlier, that he was making himself a party to the imminent failure of funding for the "NATS EMPEROR" voyage. Being the Managing Director of a ship operating company which regularly charters vessels I suggest it is not credible for Mr. Paulsson to suggest that by entering into these transactions he did not realise the effects of what he was doing or that he was thwarting any effective exercise of lien over subfreights by the Owners of "NATS EMPEROR" or "TOLMI". I repeat a point made in paragraph 11 of my First Declaration, that predated Bills of Lading were wrongfully issued to enable the freight to be paid earlier than it should have been, an arrangement which clearly assisted Brobulk/Hawknet given Hawknet's impending insolvency. The Yantai Bill of Lading was issued dated 5th April showing shipped cargo (Exhibit 2) whereas the vessel had not even arrived at Yantai on that date and only sailed from Yantai on 8th April. Freight was payable three banking days after release of Bills of Lading and it therefore should only have been paid on around

Friday 11th April. Given that Hawknet had already defaulted in making payment of hire to MAC Navigation, the Disponent Owners of "TOLMI", by 7th April and that MAC Navigation had already filed a Rule B complaint by 10th April, the wrongful predating of these Bills of Lading proved to be highly propitious to the Defendants. Mr. Paulsson says in paragraph 5 of his Declaration that the "TOLMI" complaint was filed on 10th April "after Brobulk had received the last freight payment that Hawknet had assigned to Brobulk as security for the loan." I note Mr. Paulsson has made his Declaration under penalty of perjury and also note that payment of the second instalment of subfreight by ConAgra to Brobulk was made on 10th April as may be seen from the remittance advice attached as Exhibit 1.

7.  Hawknet had defaulted in making payment of hire to MAC Navigation on 7th April 2008, as is recorded in the "TOLMI" Complaint. It is therefore also incorrect for Mr. Paulsson to say in paragraph 6 that the payment of the (first) instalment of freight in respect of the "NATS EMPEROR" to Brobulk on 8th April was made before Hawknet had defaulted on its obligations since it had already defaulted on its obligations to MAC Navigation by that date. Since Mr. Paulsson in his capacity as paying agent for Hawknet seems to consider it acceptable to mix freights from one vessel with hire payable on another vessel I presume he must have been aware of the "TOLMI" default by this time.

8.  Mr. Paulsson states in paragraph 7 of his Declaration that the agreements were implemented on the basis the vessels' names and amounts in issue were changed. He significantly fails to produce any evidence whatsoever in support of this.

9.  Nothing in the Declarations of Mr. Houghton or Mr. Paulsson in my respectful submission serves to contradict the points made in my First Declaration.

Given this 14th day of May 2008

Signed ........................................

John Hicks

# EXHIBIT 1

**John W. Hicks**

| | |
|---|---|
| From: | John W. Hicks |
| Sent: | 13 May 2008 17:56 |
| To: | bassford.m@grosvenor-partners.co.uk; thoughton@winterscott.co.uk |
| Subject: | "NATS EMPEROR" |
| Attachments: | 010000004033-0000004380-0805131744.tif |

TO : Winter Scott
ATTN : Tim Houghton/Christopher Wood
REF : TJH/nma/2/214

CC : Grosvenor Partners LLP
ATTN : Mr. M.P. Bassford

FROM : John Hicks
REF : JWH/WB/1192-17

"NATS EMPEROR"

Thank you for your fax of earlier.

The Notice of Lien over subfreights was served on your clients, as you know, on 18th April.  So far as we are aware at that date the funds were held by Brobulk as an asset of Brobulk.  No documentation has been disclosed to indicate otherwise.

Accordingly, since our clients have a valid right of lien over subfreights the funds should be paid to our clients.

As requested a copy of the Head Charter is enclosed, together with a copy of the Notice sent to your clients on 18th April, the hire statement sent to Hawknet on 14th April advising and Hawknet's message of the same date stating they would not be paying further hire.

We attach a copy of the remittance advice sent to us by the solicitors of ConAgra recording that this payment to Brobulk was freight paid under the Subcharterparty.  That should put an end to the matter.

Kindly remit the funds without further delay.

Kind regards
John Hicks
Waterson Hicks
130 Fenchurch Street
London EC3M 5LY

Tel : +44 20 7929 6060
Fax : +44 20 7929 3748
Email : jwh@watersonhicks.com
Web : www.watersonhicks.com

The contents of this e-mail message and any attachments are confidential, for the use of the addressee only and may be legally privileged. If you are not the intended recipient of this e-mail message any copying, distribution or other action taken or omitted to be taken in reliance upon it is prohibited and may be unlawful. Instead please return the message to the sender by replying to it and then delete the message and any attachments from your computer.

Wed Apr 16 11:17:12 2008                              0                              Page: 1

JPMorgan Chase Bank, N.A.
US DOLLAR FUNDS TRANSFER TRANSACTION RECORD
COPY
-----------------------------------------------------------------------

TRANSACTION DETAILS

Transaction Date:  10-APR-08

Amount:  $67977.78 USD

Debit Acct Number:                    Credit Acct Number:
9102551737                            544713631

Debit Acct Name                       Credit Acct Name
and Address:                          and Address:

OMAHA CONAGRA                         HSBC BANK PLC
MAIL STOP 90-190                      LEVEL 27
5645 N 90TH                           8 CANADA SQ
OMAHA NE 68134-                       LONDON E14 5HQ UNITED KINGDOM

Transaction Type:    Book Transfer

JPMorganChase Transaction   3829800101J0
Reference Number:

Details of Payment:
CONAGRA FREIGHT CP DD 27 MAR 08   X6174

Bank to Bank Information:

-----------------------------------------------------------------------

ADDITIONAL PARTIES

Third Party ID,                       Fourth Party ID
Name and Address:                     Name and Address:

/39545023
BROBULK LTD




Order Party Name                      Order Bank Name
and Address:                          and Address:




                                                            (T)

APR-16-2008  09:20                                      P.001

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

EXHIBIT 2

(a list of an item ye?)
TANKER BILL OF LADING TO BE USED WITH CHARTER-PARTIES

CODE NAME : CONGERBILL EDITION 1994

## B/L No. 2

## BILL OF LADING

TO BE USED WITH CHARTER-PARTIES

Shipper
CONAGRA INTERNATIONAL FERTILIZER COMPANY
6 SKIDAWAY VILLAGE WALK, SUITE 201
SAVANNAH, GA. 31411-2905

Consignee
MINISTRY OF CHEMICALS AND FERTILIZERS
(DEPTT.OF FERTILIZERS)GOVT.OF INDIA AS CONSIGNEE

ORIGINAL

Notify Address
MMTC LIMITED, NEW DELHI,

| Vessel | Port of Loading |
|---|---|
| MV NATS EMPEROR | YANTAI, CHINA |

Port of Discharge
KAKINADA, INDIA

| Shipper's Description of Goods | Gross Weight |
|---|---|
| PRILLED BULK UREA 46 PCT MINIMUM NITROGEN FERTILIZER GRADE | QUANTITY 10,755.00 MT |

PRICE USD 441.00 PMT.
AS PER CONTRACT NO. MMTC/FZ(U)2007-08/LT/04 DATED 14 MARCH 2008.

CLEAN ON BOARD
FREIGHT PAYABLE AS PER CHARTER PARTY

ENDORSEMENT THAT- ALL TERMS AND CONDITIONS OF THE RELEVANT CHARTER PARTY ARE DEEMED TO HAVE BEEN INCORPORATED THEREIN.

THE LC NUMBER 2051100IM0000044 AND DATE 080827 OF ISSUING BANK STATE BANK OF HYDERABAD SCOPE COMPLEX BRANCH NEW DELHI, INDIA.

QUOTE
(A) CONTRACT NO. MMTC/FZ(U)2007-08/LT/04 DATED 14 MARCH 2008.
(B) THIS IRREVOCABLE LETTER OF CREDIT NO 2051100IM0000044 AND DATE 080827
(C) IMPORT LICENCE NO. PART III PARA 15.3 CANALISED ITEMS SL NO .2 OF THE IMPORT EXPORT POLICY 2004-2009 AS AMENDED FROM TIME TO TIME.

(of which................on deck at Shipper's risk; the Carrier not being responsible for loss or damage howsoever arising)

| | |
|---|---|
| Freight payable as per CHARTER-PARTY dated 27th March, 2008 | SHIPPED AT THE Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get goods specified above. |
| FREIGHT ADVANCE. Received on account of freight: | Weight, measure, quality, quantity, condition, contents and value unknown. |
| | IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date any one of which being accomplished the others shall be void |
| Time used for loading:............days ............................hours. | FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |

| Freight payable at AS PER CHARTER PARTY | Place and date of Issue YANTAI, CHINA   APRIL 8, 2008 |
|---|---|
| Number of original Bs/L THREE (3/3) | Signature

Robert E. Gipson, Vice President as authorized signatory for ConAgra International Fertilizer Company as agents for and on behalf of Master of MV NATS EMPEROR, CAPT. XILAO D, PETROS |

BILL OF LADING
TO BE USED WITH CHARTER-PARTIES
CODE NAME: "CONGENBILL"
EDITION 1994.
ADOPTED BY
THE BALTIC AND INTERNATIONAL
MARITIME COUNCIL (BIMCO)

For and on behalf of
CONAGRA INTERNATIONAL FERTILIZER COMPANY

Authorized Signature

Page 1

## Conditions of Carriage.

(1) All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated.

(2) General Paramount Clause.

(a) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment, shall apply to this contract. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

(b) Trades where Hague-Visby Rules apply.
In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968—the Hague-Visby Rules—apply compulsorily, the provisions of the respective legislation shall apply to this Bill of Lading.

(c) The Carrier shall in no case be responsible for the loss or damage to the cargo, howsoever arising prior to loading into and after discharge from the Vessel or while the cargo is in charge of another Carrier, nor in respect of deck cargo or live animals.

(3) General Average.

General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994, or any subsequent modification thereof in London unless another place is agreed in the Charter Party.

Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew. The Charterers, Shippers and Consignees expressly renounce the Belgian Commercial Code, Part II, Art. 148.

(4) New Jason Clause.

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, Consignees or the owners of the cargo shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, Shippers, Consignees or owners of the goods to the Carrier before delivery.

(5) Both-to-Blame Collision Clause.

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her Owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her Owners as part of their claim against the carrying Vessel or Carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any Vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

For particulars of cargo, freight, destination, etc., see overleaf.